Katherine M. Dugdale, Bar No. 168014
KDugdale@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Christian W. Marcelo (*pro hac vice* forthcoming)
CMarcelo@perkinscoie.com
Jacob P. Dini (*pro hac vice* forthcoming)
JDini@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff
EPIC GAMES, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC., a Maryland corporation,<br><br>   Plaintiff,<br><br>  v.<br><br>SEBASTIAN ARAUJO, an individual,<br><br>   Defendant. | Case No. 2:24-cv-10835<br><br>COMPLAINT FOR:<br><br>(1) CIRCUMVENTION OF TECHNOLOGICAL MEASURES;<br>(2) BREACH OF CONTRACT;<br>(3) COPYRIGHT INFRINGEMENT; AND<br>(4) FRAUD IN THE INDUCEMENT |

## COMPLAINT

Plaintiff Epic Games, Inc. ("Epic" or "Plaintiff") brings the following complaint against Defendant Sebastian Araujo ("Araujo" or "Defendant"):

### I. NATURE OF THE CASE

1. Founded in 1991, Epic is a leader in the interactive entertainment and 3D engine technology fields.  Over the past thirty years, Epic has, among other

COMPLAINT

170355356.2

innovations, created some of the most highly acclaimed and commercially successful video games and immersive digital content and experiences.

2.    One of Epic's most famous successes is *Fortnite*, a vibrant ecosystem full of a variety of social entertainment experiences, with approximately 500 million registered players. *Fortnite* is a multi-player online experience where people interact in an online world. *Fortnite* also includes thousands of creator-made games across genres, such as adventure, roleplay, survival, and more.

3.    In *Fortnite,* players can purchase in-game cosmetic items as well as a *Fortnite* "Battle Pass," through which players can unlock cosmetics as they "level up" their accounts by playing games, completing quests and challenges, and more. Players can also earn cosmetic items without purchasing them either by participating in free events, spending virtual currency earned by progressing the Battle Pass, or by winning certain tournaments through skill and mastery of the game's mechanics. Cosmetic items have a variety of effects, from changing the appearance of the player's character to allowing the character to do a specific dance, among other things. However, none of these in-game rewards or cosmetic items provide players with a competitive advantage.

4.    In addition to online matches, Epic offers various levels of tournament play for *Fortnite*. Some tournaments are open to players of all levels and skill, while other more competitive tournaments have player level requirements— achieved through ordinary gameplay—in order to enter the tournament.[1] These more competitive *Fortnite* tournaments will often offer cash prizes to the winners.

5.    Epic does not tolerate cheating and has banned the use of cheat software in *Fortnite*. Cheat software in video games is any outside program or method used by someone to gain an unfair advantage over other, non-cheating

---

[1] In order to further combat cheating, Epic has recently updated its tournament rules with additional gameplay requirements, https://www.fortnite.com/competitive/news/fortnite-competitive-details-chapter-6-season-1.

COMPLAINT

players.  In order to play *Fortnite*, Epic requires that players agree not to use cheats to ensure a level playing field.

6.     Araujo is a cheater who has undermined this level playing field by using cheat software in *Fortnite* tournaments.  The cheat software used by Araujo conveyed the types of competitive advantages that Epic expressly prohibits in *Fortnite* such as the ability to see other players and items through solid walls and the ability to automatically aim at other players without user inputs.  Araujo pocketed thousands of dollars that other competitors in the tournaments—who played by the rules—had no real chance to win.

7.     Epic continuously implements and updates a variety of technological protection measures (often referred to as "anti-cheat") to prevent players like Araujo from using cheat software in *Fortnite*.  Araujo knows this, and despite being banned, repeatedly took steps to avoid Epic's protections, including using multiple accounts with fake names and using hardware spoofers to disguise his gaming devices.

8.     Araujo's actions harm Epic and the *Fortnite* community.  His cheating during competitive tournaments negatively impacts the other players who are playing fairly, without cheating.  Indeed, Araujo has been reported to Epic for cheating numerous times by other players.  This conduct breaches his contracts with Epic, infringes Epic's copyrights, and circumvents Epic's technological protection measures.  Epic has spent substantial resources investigating Araujo's conduct and attempting to prevent his continued cheating.

9.     Despite efforts by Epic to stop Araujo from cheating by banning him, he continues to cheat in *Fortnite* tournaments by fraudulently creating new accounts in order to evade Epic's bans.  This conduct undermines the integrity of the level playing field Epic has created and drives away non-cheating players.  As a result of Araujo's egregious conduct and resulting damage to Epic and its players, Epic brings this action seeking damages and injunctive relief against Araujo for

COMPLAINT

(i) circumventing Epic's technological measures in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201(a)(1) ("DMCA"); (ii) breaching the *Fortnite* End User License Agreement (the "*Fortnite* EULA") and several *Fortnite* tournament agreements; (iii) direct copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq.*; and (iv) fraudulently inducing Epic to grant access to *Fortnite* and Epic's services.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of Epic's federal claims under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the DMCA, 17 U.S.C. § 1201 and the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq.* This Court has supplemental jurisdiction over Epic's related state law claims under 28 U.S.C. § 1367(a).

11.    This Court has personal jurisdiction over Araujo because Araujo is a citizen of California and resides in Los Angeles County in this District.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 1400(a) because (a) Defendant resides in this District, and/or (b) a substantial part of the events giving rise to Epic's claims occurred in this District.

## III.    THE PARTIES

13.    Epic is a corporation duly organized and existing under the laws of the state of Maryland.  Epic has its principal place of business in Wake County, North Carolina.

14.    Sebastian Araujo is an individual who resides in Lomita, California.

## IV.    FACTS COMMON TO ALL CLAIMS

**A.    Epic and *Fortnite***

15.    Founded in 1991, Epic is a Cary, North Carolina-based company and leader in the interactive entertainment and 3D engine technology fields.

16.    Epic operates *Fortnite*, a vibrant ecosystem full of a variety of social entertainment experiences, with approximately 500 million registered players.

-4-

COMPLAINT

*Fortnite* was released broadly on July 25, 2017. *Fortnite* is a multi-player online experience where people interact in an online world. *Fortnite* is free to download; however, *Fortnite* sells in-game items such as costumes for characters.

17.    *Fortnite*'s extremely popular play-for-free "Battle Royale" was released to the public on September 26, 2017. *Fortnite*'s Battle Royale involves dropping a maximum of 100 players into a large map where the players battle each other until only one player (or team) remains standing. *Fortnite*'s Battle Royale can include *Fortnite*'s unique "building" mechanic in which players can construct and take advantage of structures, ramps, and cover to defeat other players and characters in intense combat. *Fortnite*'s "Zero Build" Battle Royale game mode removes this build mechanic, emphasizing the players' precision, thinking, and spatial awareness skills.

18.    In *Fortnite*'s Battle Royale, a player's success is often determined by their skill level, which can be practiced and honed through gameplay. For example, a player's success in combat is often determined by their ability to use their controller, or mouse and keyboard, to precisely maneuver their character, maintain awareness of their virtual surroundings, place and edit structures in an advantageous manner, and to aim at their target quickly and accurately.

19.    Epic designed *Fortnite*'s Battle Royale to ensure a fair playing field for all players. Epic does not sell or provide items to players that would give any user a competitive advantage and expressly prohibits cheating.

20.    Epic also offers various *Fortnite* tournaments, including competitive tournaments with cash prizes for players who have worked hard to develop their playing skills. Competitive tournaments with cash prizes require a minimum *Fortnite* account level in order to compete. A player's *Fortnite* account level is determined by combining the levels a player has gained across every season of *Fortnite*. Players increase their account level by playing the game and leveling up.

21.    Cheaters use and develop a variety of different cheat methods in an

170355356.2

COMPLAINT

attempt to gain unfair competitive advantages.

22.    Epic constantly develops, implements, and updates technological protection measures designed to prevent individuals using cheat software from accessing *Fortnite*.  When Epic detects a user attempting to play or playing *Fortnite* while using cheat software, that player is either prevented from loading and playing *Fortnite* at all, or kicked out of *Fortnite* once cheat software is detected, and is banned from using *Fortnite*.

**B.    Epic's Copyrights in *Fortnite***

23.    Epic is the author and owner of all rights and title to the copyrights in *Fortnite*, including, without limitation, in its computer software and audiovisual works.

24.    Epic's relevant copyrights in various versions of *Fortnite*'s software code and audiovisual works are the subjects of U.S. Copyright Registrations listed in the table below.

| Title | Registration No. | Registration Date | Nature of Work |
|---|---|---|---|
| *Fortnite* | TX 8-766-571 | Jan. 31, 2019 | Revised computer program |
| *Fortnite* | TX 8-507-210 | Mar. 21, 2018 | Revised computer program |
| *Fortnite* | PA 2-066-544 | Sept. 13, 2017 | Revised computer program; audiovisual material |
| *Fortnite* | TX 8-186-254 | July 14, 2015 | Computer program |
| *Fortnite* | TX 8-254-659 | Mar. 3, 2016 | Computer program |
| *Fortnite* | TXu 1-895-864 | Dec. 18, 2013 | Computer program |
| *FORTNITE* (2016 Rev. 2) | TX 8-352-178 | Dec. 23, 2016 | Computer program |
| *Fortnite* – Battle Royale Mode | PA 2-087-919 | Mar. 23, 2018 | Revised and new audiovisual material |
| *Fortnite* Battle Royale Chapter 5 Season 1 | TX 9-420-173 | July 3, 2024 | Computer program; audiovisual material |

COMPLAINT

| *Fortnite* Chapter 4: Season OG | TX 9-388-536 | Apr. 25, 2024 | Computer program; audiovisual |
| *Fortnite* Reload | TX 9-437-406 | Sept. 17, 2024 | Computer program; audiovisual material |
| *Fortnite* (Rev. 3) | TX 8-508-464 | Sept. 8, 2017 | Computer program; audiovisual material |

True and correct copies of the certificates of registration for the above-listed copyrights are attached as **Exhibit 1**.

**C.    Epic's Efforts to Protect *Fortnite* from Cheaters**

25.    Epic takes the issue of cheating seriously.  Epic expressly prohibits cheating in its agreements with *Fortnite* players, implements and requires all players to install anti-cheat technological measures to identify and stop the use of cheat software, and permanently bans those who use cheat software.

26.    In order to play *Fortnite*, a user must agree to the *Fortnite* End User License Agreement (the "*Fortnite* EULA").  When users download the *Fortnite* software, the *Fortnite* EULA is displayed on-screen for the users to accept before they can play Fortnite.  This is true for accounts created on any type of device or platform.

27.    For the relevant *Fortnite* EULA at issue here, the user must affirmatively accept the agreement by checking a box that reads, "I have read and agree with the End User License Agreement." After clicking that box, the person accepting the agreement must confirm a second time by clicking an "Accept" button before playing.  If a user does not complete these steps, the user will not be able to play Fortnite.  A true and correct copy of the *Fortnite* EULA is attached as **Exhibit 2**.

28.    The *Fortnite* EULA grants a "personal, non-exclusive, non-transferable, non-sublicensable limited right and license to install and use" *Fortnite*, subject to several license conditions.

29.    Among other conditions, a *Fortnite* licensee may not:

170355356.2

COMPLAINT

(a) "remove, disable, circumvent, or modify any proprietary notice or label or security technology included in it;"

(b) "create, develop, distribute, or use any unauthorized software programs to gain advantage in any online or other game modes;" or

(c) "behave in a manner which is detrimental to the enjoyment of [*Fortnite*] by other users as intended by Epic, in Epic's sole judgment, including but not limited to… running or using methods which are not authorized by Epic and which interfere with the outcome and/or the course of [*Fortnite*], (including Cheats, bots, scripts, or mods not expressly authorized by Epic) by giving you and/or another user an advantage over other users who do not use such methods, or making or otherwise contributing to such unauthorized software."

30. The *Fortnite* EULA defines "Cheats" as "programs, methods, or other processes which may give players an unfair competitive advantage in [*Fortnite*]."

31. The *Fortnite* EULA terminates "automatically without notice if you fail to comply with any of its terms and conditions." "Upon any termination, the License will automatically terminate, you may no longer exercise any of the rights granted to you by the License, and you must destroy all copies of [*Fortnite*] in your possession."

32. In addition to agreeing to the *Fortnite* EULA, prior to playing in any *Fortnite* tournament, players must affirmatively accept and agree to abide by tournament rules which form binding agreements between Epic and the player (the "Tournament Agreements"). A player must accept the Tournament Agreement before that player can play in a tournament. If the player chooses the "Decline" option, they will not be permitted to compete in the tournament. The Tournament Agreements expressly prohibit "[u]sing any kind of cheating device, program, or

COMPLAINT

similar cheating method to gain a competitive advantage." True and correct copies of the Tournament Agreements entered into by Araujo are attached as **Exhibit 3**.

33.     Epic also employs a variety of technological protection measures that are designed to prevent cheat users from accessing and/or violating Epic's rights in *Fortnite*.

34.     For instance, downloads of *Fortnite* also include downloading Epic's cheat detection software, which is one of the measures Epic uses to restrict access to *Fortnite*. If the cheat detection software detects cheat software on a player's computer, the player will be prevented from launching *Fortnite* on their computer, viewing the *Fortnite* audiovisual displays, or otherwise using *Fortnite*.

35.     *Fortnite* players who are detected using or attempting to use cheat software are prevented from launching or otherwise using *Fortnite*, or are immediately kicked out of *Fortnite*.

36.     Epic also employs hardware ID bans against *Fortnite* players that are detected using cheat software. When Epic applies a hardware ID ban to a particular player's hardware (e.g., a computer), that hardware (identified by the hardware's unique identifiers) is prevented from launching and using *Fortnite*.

**D.     Araujo's Unlawful Acts**

37.     In order to download and play *Fortnite*, and play in *Fortnite* tournaments, Araujo agreed to be bound by the *Fortnite* EULA and the Tournament Agreements. The EULA and each of the Tournament Agreements prohibit cheating.

38.     On June 5, 2024, Epic detected a direct memory access ("DMA") device installed on the computer Araujo was using to play in a *Fortnite* tournament. On June 6, 2024, after Epic detected the DMA device on Araujo's computer, Epic banned him for cheating.

39.     Despite being banned, by at least as early as June 19, 2024, Araujo continued his wrongful conduct. He played in *Fortnite* tournaments by using fake

COMPLAINT

accounts and continued using a DMA device in connection with, on information and belief, a DMA cheat in order to gain an unfair advantage during the tournaments.

40.     A DMA cheat operates in a manner specifically designed to avoid detection by Epic's anti-cheat measures.

41.     Most *Fortnite* cheats—and cheats for other video games—require the cheat software to be loaded on the same computer running *Fortnite* so that it can read the game memory during game play.  The game memory contains portions of the *Fortnite* software code that are in use while running the program on the computer.  This often enables Epic's anti-cheat measures, which are also loaded to the computer running *Fortnite*, to detect the cheat software because it is running alongside *Fortnite* on the same computer.

42.     DMA cheats, however, use two computers to operate.  The first computer runs the video game, here, *Fortnite* (the "game computer").  The second computer runs the cheat software (the "cheat computer").  For the cheat software to operate, it requires access to *Fortnite*'s memory as *Fortnite* is running on the game computer.  To transmit the *Fortnite* game memory to the cheat software, the cheat user inserts a DMA card into the game computer.  The player then connects the DMA card directly to the cheat computer.  The DMA card serves as a middleman for the game memory:  it reads the *Fortnite* memory running on the game computer and transmits a copy to the cheat computer.

43.     The primary purpose of using two computers for DMA cheats is to operate the cheat software on a computer that does not have Epic's anti-cheat measures to avoid being detected by those anti-cheat measures.

44.     Using a DMA cheat allows the cheater to see information on the cheat computer that is hidden from non-cheating players.  For instance, one unfair competitive advantage a DMA cheat can provide is the location of other players or items, and displaying additional information about those players.  This type of

-10-

COMPLAINT

advantage is referred to as an "ESP" (extra-sensory perception) cheat feature.

45.     Another unfair competitive advantage cheaters using a DMA cheat can gain is referred to as "aimbot." One method of using aimbot through a DMA cheat involves using a "keyboard and mouse box" through which the cheat software can control the cheater's keyboard and mouse inputs.  This enables the DMA cheat to aim for the cheater by effectively moving their mouse.  And, because the cheat software knows the locations of other players through the copied *Fortnite* memory, the cheat software can automatically aim the cheater's weapon with perfect accuracy.  Players that play fairly, without aimbot, must develop and use their aiming skills with their controller, mouse or keyboard to hit their targets.

46.     In order for the DMA cheat software to operate in connection with *Fortnite*, the cheat software contains copied portions of the *Fortnite* software code within the cheat software.  Each time the cheat software is run on a computer, a copy of the cheat software code—and thus the copied portions of the *Fortnite* code—is created.

47.     Araujo has been banned for cheating, but he has continued to cheat in *Fortnite* tournaments by using fake accounts.  He disguises himself by using accounts with fake names and by using hardware spoofers to alter the serial numbers on his devices.  Device serial numbers are one method Epic uses to identify a cheat user's computer in order to enforce a ban.

48.     Using these fake accounts and hardware spoofers, Araujo entered into over 18 Tournament Agreements between June 2024 and October 2024, and all of these accounts show evidence of cheating by Araujo.

49.     Araujo has been awarded cash prizes at the expense of non-cheating players.

50.     Epic received numerous player reports regarding Araujo's cheating and confirmed through analysis of his gameplay in the tournaments that Araujo was using a DMA device and cheating during *Fortnite* tournaments.  On such and other

COMPLAINT

information and belief, Araujo used a DMA cheat with ESP and aimbot features in order to give himself an unfair advantage in *Fortnite* tournaments.

51.    Through his conduct, Araujo has circumvented Epic's technological measures, breached his agreements with Epic and infringed Epic's copyrights.

52.    Araujo circumvented Epic's technological measures in order to access *Fortnite* by using cheat software, additional hardware and devices to avoid detection of the cheat software, and a hardware spoofer.

53.    He has infringed Epic's copyrights by making unauthorized and infringing copies of the software code for *Fortnite* while using the cheat software.

54.    Araujo breached the *Fortnite* EULA and the Tournament Agreements by using cheat software to gain an unfair competitive advantage over other *Fortnite* players.

55.    As a result of this breach, the *Fortnite* EULA between Epic and Araujo automatically terminated, and thus his license to use *Fortnite* terminated, and he was required to destroy all copies of *Fortnite* in his possession.

56.    Araujo did not destroy his copies of *Fortnite*, and instead continues to play (and cheat in) *Fortnite*.  Araujo has further infringed Epic's copyrights by continuing to use cheat software on unauthorized and unlicensed copies of *Fortnite* after his *Fortnite* EULA with Epic terminated.  Indeed, Araujo continues to play in competitive *Fortnite* tournaments even after being repeatedly banned by Epic for cheating.

57.    Araujo has defrauded Epic by creating multiple fake Epic accounts and agreeing to the *Fortnite* EULA and the Tournament Agreements in order to play in *Fortnite* tournaments on each account.

58.    At least three of the Epic accounts used by Araujo to play *Fortnite* were created shortly after he was banned for cheating on June 6, 2024.  Araujo created new accounts on at least June 21, June 25 and July 29, 2024.

59.    To create these Epic accounts and avoid the ban, Araujo intentionally

COMPLAINT

misrepresented and obscured his identity by providing false and misleading personal information to Epic. Epic relied on these misrepresentations in order to unknowingly grant Araujo access to Epic's services, including *Fortnite*.

60.     Araujo used these fake accounts, and other pre-existing fake accounts that Araujo created, in order to access *Fortnite* after being banned. Despite being banned for cheating, he accepted and agreed to be bound by the *Fortnite* EULA on at least the following dates: June 7, June 19, June 21, June 22, June 25, July 2, July 29, September 11, and September 23, 2024.

61.     Araujo also used his fake accounts to enter into *Fortnite* tournaments and agreed to and accepted the applicable Tournament Agreements on multiple occasions, including at least the following dates: June 10, June 11, June 24, June 29, July 29, July 31, August 5, August 7, August 28, September 2, September 9, September 11, September 22, September 23, September 25, September 30, October 2 and October 6, 2024.

62.     By creating the Epic accounts and accepting the *Fortnite* EULAs and the Tournament Agreements, Araujo repeatedly misrepresented to Epic that he intended to comply with the contracts, despite having no intention of doing so and, for accounts used after he was banned, despite knowing that his authorization to access *Fortnite* and Epic's services had already terminated.

63.     Epic relied on these misrepresentations in order to unknowingly grant Araujo access to Epic's services, including *Fortnite*. Epic's reliance on Araujo's misrepresentations was justified because Araujo took steps to conceal his true identity. Had Epic known Araujo was creating these accounts, Epic would not have permitted Araujo to do so and would not have granted Araujo access to *Fortnite*.

64.     Araujo intended to induce Epic's reliance on his misrepresentations. Epic had banned Araujo's Epic accounts previously due to Araujo's cheating. On information and belief, Araujo knew that if he provided accurate identifying information, Epic would not have permitted him to create these accounts and access

*Fortnite*.

65.    Araujo's conduct has caused significant harm to Epic and the *Fortnite* community.

66.    Araujo used cheat software in order to obtain an unfair advantage in several *Fortnite* tournaments, winning thousands of dollars by doing so.

67.    Despite Epic's efforts to ban Araujo for cheating, he has created fake accounts by making fraudulent misrepresentations regarding his identity in order to gain access to Epic's services, and continues to play in *Fortnite* tournaments using cheat software, bypassing several bans and Epic's anti-cheat software.

68.    Epic has expended significant resources investigating and combatting Araujo's cheating and fraud.

69.    Araujo's wrongful conduct damages Epic's goodwill with the *Fortnite* community and the integrity of *Fortnite* tournaments.

70.    Araujo's misrepresentations and use of cheat software, especially in competitive *Fortnite* tournaments, undermines the integrity of *Fortnite* and causes non-cheating players to stop playing.

71.    Epic is harmed when non-cheating players stop playing *Fortnite* including because these players no longer purchase in-game passes, cosmetics, and related items.

## FIRST CLAIM
### [Circumvention of Technological Measures – 17 U.S.C. § 1201(a)]

72.    Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 71 of this complaint, as if set forth fully herein.

73.    Epic is the owner of valid, registered, and enforceable copyrights in *Fortnite*.

74.    Epic has designed and implemented technological measures, including but not limited to cheat detection software and hardware ID bans.

75.    In the ordinary course of the operation of these technological measures, they require the application of information, or a process or a treatment,

-14-

COMPLAINT

with the authority of Epic, to gain access to *Fortnite*, and/or they prevent, restrict, or otherwise limit the exercise of a right of Epic in *Fortnite*.

76.     Araujo circumvented Epic's technological measures in order to access *Fortnite*, including by using cheat software, additional hardware and devices to avoid detection of the cheat software, and a hardware spoofer.

77.     As a direct result of Araujo's circumvention, Epic has been injured and will continue to be injured.

78.     Araujo's actions were and are willful.

79.     Araujo's conduct has caused irreparable harm to Epic, and, unless enjoined, will cause further irreparable harm for which Epic has no adequate remedy at law.

80.     Epic is entitled to the relief provided by 17 U.S.C. § 1203, including, but not limited to, injunctive relief, an order for the impounding, modification, or destruction of any device or product in Araujo's custody or control involved in the circumvention of Epic's technological measures, damages measured at Epic's election either by Epic's actual damages, or statutory damages, and Epic's costs and attorneys' fees.

## SECOND CLAIM
### [Breach of Contract]

81.     Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 80 of this complaint, as if set forth fully herein.

82.     Araujo accepted and agreed to the *Fortnite* EULA.  In exchange, and in accordance with the Fortnite EULA, Epic granted Araujo access to *Fortnite*.

83.     By agreeing to the *Fortnite* EULA, Araujo entered into a valid, binding and enforceable contract with Epic.

84.     The *Fortnite* EULA expressly prohibits:

(a)     "remov[ing], disable[ing], circumvent[ing], or modify[ing] any proprietary notice or label or security technology included in it;"

(b)    "us[ing] any unauthorized software programs to gain advantage in any online or other game modes;" and

(c)    "behav[ing] in a manner which is detrimental to the enjoyment of [*Fortnite*] by other users as intended by Epic, in Epic's sole judgment, including but not limited to… running or using methods which are not authorized by Epic and which interfere with the outcome and/or the course of [*Fortnite*], (including Cheats, bots, scripts, or mods not expressly authorized by Epic) by giving you and/or another user an advantage over other users who do not use such methods, or making or otherwise contributing to such unauthorized software."

85.    In order to play in competitive *Fortnite* tournaments, Araujo also accepted and agreed to the Tournament Agreements.  In exchange, and in accordance with the Tournament Agreements, Epic allowed Araujo to play in the corresponding *Fortnite* tournaments.

86.    The Tournament Agreements are valid, binding and enforceable contracts.

87.    Each Tournament Agreement expressly prohibits "[u]sing any kind of cheating device, program, or similar cheating method to gain a competitive advantage."

88.    Through the conduct alleged herein, Araujo breached the *Fortnite* EULA and the Tournament Agreements by using cheat software to gain unfair and unauthorized advantages in *Fortnite* tournaments and by circumventing Epic's technological measures restricting access to *Fortnite*.

89.    As a result of Araujo's actions, Epic has suffered damages in an amount to be proven at trial.

/ / /

/ / /

-16-

COMPLAINT

## THIRD CLAIM
### [Direct Copyright Infringement – 17 U.S.C. § 501, *et seq.*]

90.    Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 89 of this complaint, as if set forth fully herein.

91.    Epic owns multiple valid, registered, and enforceable copyrights in *Fortnite*, including in the game's software code and audiovisual works.

92.    These copyrights are represented in the copyright registration certificates referenced above and set out in Exhibit 1.

93.    As the owner of the copyrights in *Fortnite*, Epic has the exclusive right to reproduce the copyrighted works, prepare derivative works, distribute copies of the copyrighted works, and to perform the copyrighted works publicly.

94.    Through his use of cheat software, Araujo made unauthorized copies of the software code for *Fortnite*.  This conduct infringes Epic's copyrights in *Fortnite* by reproducing, without Epic's authorization, the copyrighted works.

95.    Araujo further infringed Epic's copyrights by continuing to use unauthorized and unlicensed copies of *Fortnite* after his *Fortnite* EULA with Epic terminated.

96.    Epic has suffered actual damages as a result of Araujo's infringement.

97.    Epic is also entitled to receive any profits made by Araujo in connection with their infringement, including his tournament prizes.

98.    Alternatively, Epic is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).

99.    Araujo's infringement was willful.  Araujo knowingly and intentionally infringed Epic's copyrights by continuing to use cheat software despite repeated bans.

/ / /

/ / /

/ / /

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FOURTH CLAIM
### [Fraud in the Inducement]

100.   Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 99 of this complaint, as if set forth fully herein.

101.   Araujo was banned for cheating on June 6, 2024.  After that date, he registered for new Epic accounts on, at least, June 21, June 25, and July 29, 2024 in order to access Epic's services and play *Fortnite*.

102.   Araujo used these new fake accounts, as well as other pre-existing fake accounts, to access *Fortnite* after being banned and he accepted and agreed to be bound by the *Fortnite* EULA on at least June 7, June 19, June 21, June 22, June 25, July 2, July 29, September 11, and September 23, 2024.

103.   By accepting the *Fortnite* EULA, Araujo misrepresented that he would not disable or circumvent any security measures; "create, develop, distribute, or use any unauthorized software programs to gain advantage in any online or other game modes;" or "behave in a manner which is detrimental to the enjoyment of [*Fortnite*] by other users as intended by Epic," including through use of "Cheats, bots, scripts, or mods not expressly authorized by Epic."

104.   Similarly, after being banned, Araujo used his fake accounts to play in competitive *Fortnite* tournaments, and he accepted and agreed to be bound by the Tournament Agreement for each tournament.  On at least June 10, June 11, June 24, June 29, July 29, July 31, August 5, August 7, August 28, September 2, September 9, September 11, September 22, September 23, September 25, September 30, October 2 and October 6, 2024, Araujo misrepresented that he would not use "any kind of cheating device, program, or similar cheating method to gain a competitive advantage."

105.   Araujo's misrepresentations were reasonably calculated to deceive Epic into believing that he would abide by the contractual terms.  Araujo took steps to conceal his true identity after he was initially banned by Epic, such that Epic

170355356.2

could not have known that Araujo was attempting to create the accounts and misrepresenting his agreement to the contractual terms.

106.    Araujo had no intention of abiding by these contractual terms.  Araujo created the fake Epic accounts and entered into the contractual agreements for the purpose of evading Epic's bans in order to cheat in *Fortnite* and he immediately violated these promises by continuing to cheat in *Fortnite*.  Araujo misrepresented and concealed his true identity and other personally identifying information (such as email addresses and IP addresses) to deceive Epic.

107.    Araujo was aware of the falsity of his representations because he had been banned by Epic previously for cheating, and he intended to deceive Epic into accessing Epic's services because he knew that Epic would not have permitted him to play *Fortnite* if Epic knew his true identity.

108.    Based on Araujo's intentional misrepresentations, Epic was induced to allow Araujo to register for Epic accounts to play *Fortnite* and to participate in *Fortnite* tournaments.  Had Epic known of Araujo's true intentions, Epic would not have allowed him to register for the accounts and access *Fortnite* or play in the tournaments.  As soon as Epic became aware of Araujo's wrongful actions, Epic banned the corresponding accounts created by Araujo.

109.    Epic justifiably relied on Araujo's misrepresentations because Araujo took steps to conceal his true identity and Epic unknowingly granted Araujo access to Epic's services, including *Fortnite*.

110.    As a result of Epic's reliance on Araujo's misrepresentation, Epic has suffered damage to its goodwill and lost resources, such as the monetary and personnel resources associated with investigating and redressing Araujo's unauthorized activities, which Epic would not have been forced to expend but for Araujo's misrepresentations.

/ / /

/ / /

-19-

COMPLAINT

111.   Epic is entitled to all remedies available at law or equity, including injunctive relief, compensatory damages and/or other equitable or monetary remedies.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Epic Games, Inc. prays for the following relief:

A.    That judgment be entered in Epic's favor against Araujo on all claims.

B.    That Araujo and his officers, agents, representatives, servants, employees, heirs, successors, and assigns, and all others in active concert or participation with Araujo be permanently enjoined from:

    1)    Infringing, or inducing, contributing, or enabling others to infringe Epic's copyrights;

    2)    Downloading, installing, possessing, and/or using any of Epic's copyrighted works, including but not limited to *Fortnite*;

    3)    Circumventing any of Epic's technological measures that controls access to Epic's copyrighted works, including but not limited to *Fortnite*;

    4)    Using any software or device not authorized by Epic that provides *Fortnite* players a competitive advantage in *Fortnite*; and

    5)    Aiding or assisting another person or entity in any of the activities described in (1)-(4) above.

C.    An award to Epic of all damages permitted by law, including, but not limited to, statutory damages.

D.    An award to Epic of its costs incurred in this suit as well as reasonable attorneys' fees.

E.    Other such relief as the Court deems just and proper.

170355356.2

COMPLAINT

1   Dated:  December 16, 2024                    **PERKINS COIE LLP**

2

3                                               By: <u>/s/ *Katherine M. Dugdale*</u>

4                                                     Katherine M. Dugdale

5                                               Attorneys for Plaintiff Epic Games, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-21-

COMPLAINT