1  Katherine M. Dugdale, Bar No. 168014
   KDugdale@perkinscoie.com
2  PERKINS COIE LLP
   1888 Century Park East, Suite 1700
3  Los Angeles, California 90067-1721
   Telephone:  +1.310.788.9900
4  Facsimile:   +1.310.788.3399

5  Christian W. Marcelo, Bar No. 51193 (*pro hac vice* filed)
   CMarcelo@perkinscoie.com
6  Jacob P. Dini, Bar No. 54115 (*pro hac vice* filed)
   JDini@perkinscoie.com
7  PERKINS COIE LLP
   1201 Third Avenue, Suite 4900
8  Seattle, Washington 98101-3099
   Telephone:  +1.206.359.8000
9  Facsimile:   +1.206.359.9000

10 Attorneys for Plaintiff
   EPIC GAMES, INC.

11

12                UNITED STATES DISTRICT COURT

13                CENTRAL DISTRICT OF CALIFORNIA

14

15 EPIC GAMES, INC., a Maryland          Case No. 2:24-CV-10835-DDP-JC
   corporation,
16                                        **PLAINTIFF EPIC GAMES, INC.'S**
                Plaintiff,                **MEMORANDUM OF POINTS AND**
17                                        **AUTHORITIES IN SUPPORT OF**
          v.                              **MOTION FOR DEFAULT**
18                                        **JUDGMENT AGAINST**
   SEBASTIAN ARAUJO, an individual,      **DEFENDANT SEBASTIAN**
19                                        **ARAUJO**
                Defendant.
20                                        Hearing:
                                          Date: June 2, 2025
21                                        Time: 10:00 a.m.
                                          Place:  Courtroom 9C
22                                                  350 West 1st Street
                                                  Los Angeles, CA. 90012
23

24

25                                        *Honorable Dean D. Pregerson*

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3    I.      INTRODUCTION ................................................................................ 2

4    II.     BACKGROUND ................................................................................. 3

5            A.    Epic and *Fortnite* ................................................................. 3

6            B.    Defendant's Unlawful Acts .................................................. 4

7            C.    Defendant Harmed Epic ....................................................... 6

8            D.    Procedural History ............................................................... 6

9    III.    ARGUMENT ..................................................................................... 7

10           A.    Epic Has Satisfied the Local Rule 55-1 Procedural
                   Requirements ........................................................................ 8

11           B.    The *Eitel* Factors Weigh In Favor of Default Judgment ..................... 8

12                 1.    Epic Will Be Prejudiced ............................................. 9

13                 2.    Epic Has Sufficiently Pled Meritorious Claims ................ 9

14                       a.    Circumvention of Technological Measures ................. 10

15                       b.    Breach of Contract ....................................... 11

16                       c.    Copyright Infringement ................................. 12

17                       d.    Fraud in the Inducement ............................... 13

18                 3.    The Remaining *Eitel* Factors Strongly Favor Default
                         Judgment ........................................................... 15

19

20           C.    Epic Is Entitled to Monetary Recovery ............................... 16

21           D.    Epic Is Entitled to Recover its Attorneys' Fees and Costs .............. 19

22           E.    Epic Is Entitled to a Permanent Injunction ........................ 20

23   IV.     CONCLUSION ............................................................................. 22

24

25

26

27

28

180389829.10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aifang v. Velocity VIII L.P.*,
No. CV 14-07060 SJO (MRWx), 2016 WL 4520641 (C.D. Cal.
Sept. 26, 2016) ................................................................................................ 16

*Apple, Inc. v. Psystar Corp.*,
673 F. Supp. 2d 943 (N.D. Cal. 2009) ............................................................ 20

*Blizzard Entm't, Inc. v. Bossland GmbH*,
No. SA CV 16-1236-DOC, 2017 WL 7806600 (C.D. Cal. Mar. 31,
2017) .................................................................................................... 9, 13, 15, 21

*Bungie, Inc. v. Bansal*,
No. 2:21-cv-01111-TL, 2023 WL 3309496 (W.D. Wash. May 8,
2023) .......................................................................................................... 19, 21

*Bungie, Inc. v. Claudiu-Florentin*,
No. 2:21-cv-01114-TL, 2023 WL 3158585 (W.D. Wash. Apr. 27,
2023) ................................................................................................................ 20

*Craigslist, Inc. v. Naturemarket, Inc.*,
694 F. Supp. 2d 1039 (N.D. Cal. 2010) ..................................................... 15, 19

*Danning v. Lavine*,
572 F.2d 1386 (9th Cir. 1978) .......................................................................... 9

*Disney Enters., Inc. v. VidAngel, Inc.*,
371 F. Supp. 3d 708 (C.D. Cal. 2019) ............................................................ 10

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ........................................................................... 12

*E.I. Du Pont de Nemours and Co. v. Drabek*,
No. CV 12-10574 DDP, 2013 WL 4033630 (C.D. Cal. May 3,
2013)
............................................................................................... 8, 9, 15, 16

*eBay, Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ......................................................................................... 21

180389829.10

1

# TABLE OF AUTHORITIES
## (continued)

2

3

**Page(s)**

4

*Eitel v. McCool,*
   782 F.2d 1470 (9th Cir. 1986) ................................................................. 7, 8

5

6

*Facebook, Inc. v. Sahinturk,*
   No. 20-cv-08153-JSC, 2022 WL 1304471 (N.D. Cal. May 2, 2022) ............... 11

7

8

*Fogerty v. Fantasy, Inc.,*
   510 U.S. 517 (1994) ........................................................................................ 19

9

10

*Halicki Films, LLC v. Sanderson Sales & Mktg.,*
   547 F.3d 1213 (9th Cir. 2008) ........................................................................ 20

11

12

*Historical Research v. Cabral,*
   80 F.3d 377 (9th Cir. 1996) ............................................................................. 19

13

14

*Hosp. Mktg. Concepts, LLC v. Six Continents Hotels, Inc.,*
   No. SACV 15-01791, 2016 WL 9045621 (C.D. Cal. Jan. 28, 2016) ............... 14

15

16

*Landstar Ranger, Inc. v. Path Enters., Inc.,*
   725 F. Supp. 2d 916 (C.D. Cal. 2010) ............................................................ 9

17

*MAI Sys. Corp. v. Peak Comput., Inc.,*
   991 F.2d 511 (9th Cir. 1993) ........................................................................... 13

18

19

*Manta v. Chertoff,*
   518 F.3d 1134 (9th Cir. 2008) ........................................................................ 14

20

21

*Microsoft Corp. v. BH Tech, Inc.,*
   No. 2:16-cv-2664-ODW-RAO, 2016 WL 8732074 (C.D. Cal. Sept.
   2, 2016) ........................................................................................................... 16

22

23

*Parino v. BidRack, Inc.,*
   838 F. Supp. 2d 900 (N.D. Cal. 2011) ...................................................... 13, 14

24

25

*PepsiCo, Inc. v. Cal. Sec. Cans,*
   238 F. Supp. 2d 1172 (C.D. Cal. 2002) .......................................................... 9

26

27

*PepsiCo, Inc. v. Triunfo-Mex, Inc.,*
   189 F.R.D. 431 (C.D. Cal. 1999) .................................................................... 9

28

180389829.10

2:24-CV-10835-DDP-JC

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
   793 F.2d 1132 (9th Cir. 1986) ................................................................. 21

*Sony Comput. Entm't Am., Inc. v. Divineo, Inc.*,
   457 F. Supp. 2d 957 (N.D. Cal. 2006) ..................................................... 19

*Sony Interactive Entm't LLC v. Scales*,
   No. EDCV 18-2141 JGB (KKx), 2019 WL 13065920 (C.D. Cal.
   Mar. 18, 2019) ................................................................................... passim

*Starbucks Corp. v. Heller*,
   No. CV 14-01383 MMM, 2015 WL 13919137 (C.D. Cal. May 28,
   2015) ........................................................................................................ 17

*Stephen Gould Corp. v. Osceola*,
   No. 2:22-cv-08347-WLH-AGR, 2023 WL 8254483 (C.D. Cal. Oct.
   13, 2023) .................................................................................................. 13

*TeleVideo Sys, Inc. v. Heidenthal*,
   826 F.2d 915 (9th Cir. 1987) ..................................................................... 9

*Ticketmaster L.L.C. v. Prestige Entm't, Inc.*,
   306 F. Supp. 3d 1164 (C.D. Cal. 2018) ................................................... 14

*VBConversions LLC v. Gulf Coast Ventures, Inc.*,
   No. CV 12-8265 JGB, 2016 WL 11687660 (C.D. Cal. Aug. 10,
   2016) ................................................................................................. 17, 19

*Warner Bros. Entm't Inc. v. Caridi*,
   346 F. Supp. 2d 1068 (C.D. Cal. 2004) ................................................... 16

*Wecosign, Inc. v. IFG Holdings, Inc.*,
   845 F. Supp. 2d 1072 (C.D. Cal. 2012) ................................................... 21

*Yelp, Inc. v. Catron*,
   7 F. Supp. 3d 1082 (N.D. Cal. 2014) ....................................................... 11

**STATUTES**

17 U.S.C. § 502(a) ......................................................................................... 21

180389829.10

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

17 U.S.C. § 504(c) .................................................................................................. 16

17 U.S.C. § 504(c)(1)–(2) ...................................................................................... 17

17 U.S.C. § 505 ...................................................................................................... 19

17 U.S.C. § 1201(a)(1)(A) ...................................................................................... 10

17 U.S.C. § 1203(b)(1) ........................................................................................... 21

17 U.S.C. § 1203(b)(4) ........................................................................................... 19

17 U.S.C. § 1203(c) ................................................................................................ 16

17 U.S.C. § 1203(c)(3)(A) ...................................................................................... 16

50 U.S.C. App. § 521 ............................................................................................... 8

Copyright Act ................................................................................................... passim

Digital Millennium Copyright Act ................................................................... passim

Servicemembers Civil Relief Act ............................................................................. 8

**RULES**

Fed. R. Civ. P. 9(b) ................................................................................................ 14

Fed. R. Civ. P. 55(b)(2) ........................................................................................ 7, 8

Local Rule 55-1 .................................................................................................... 7, 8

Local Rule 55-3 ...................................................................................................... 20

2:24-CV-10835-DDP-JC

180389829.10

# I.    INTRODUCTION

Defendant Sebastian Araujo ("Defendant") is a cheater who, despite being banned by plaintiff Epic Games, Inc. ("Epic"), continued to use cheat software in order to win money in *Fortnite* tournaments.  Epic is the operator and owner of all rights, title, and interest in *Fortnite*, a multiplayer online experience where approximately 500 million registered players interact in an online world.  Among the many games and modes available to players in *Fortnite*, "Battle Royale" is one of the most popular, in which up to 100 individuals compete against each other until only one player or team remains standing at the end.  *Fortnite* players can also participate in highly competitive tournaments that award cash prizes to players who have worked hard to develop their playing skills.

Rather than compete on a level playing field, Defendant used cheat software designed to evade Epic's anti-cheat technical measures in order to win money in these tournaments.  The cheat software allows Defendant to do things in *Fortnite* that non-cheating players cannot, including seeing other players through walls and to automatically aim at other players.  His cheating gave him an enormous advantage over other players, allowing him to win thousands of dollars in prize money.  When Epic caught him cheating and banned him from competing in tournaments, Defendant used other accounts and even created new Epic Games accounts to hide his identity and continued cheating in *Fortnite* tournaments.  Epic brought this action to bring an end to his cheating.  Defendant was served on February 10, 2025.  His response to Epic's complaint was due no later than March 3, 2025, and Defendant failed to answer or otherwise respond.

Epic respectfully requests that the Court enter a default judgment holding Defendant responsible for his cheating, including an award of $267,800 in monetary damages, $8,956 in attorneys' fees, and a permanent injunction barring Defendant from accessing or using *Fortnite* or assisting others in infringing Epic's copyrights or circumventing Epic's technological measures.

## II.    BACKGROUND

### A.    Epic and *Fortnite*

Founded in 1991, Epic is a leader in the interactive entertainment and 3D engine technology fields and the owner and operator of *Fortnite*, a vibrant ecosystem full of a variety of social entertainment experiences with approximately 500 million registered players.  Doc. No. 1 ("Compl.") ¶ 15.  Epic is the author and owner of all rights and title to the copyrights in *Fortnite*, including the computer software and audiovisual works that make up *Fortnite*, and has obtained copyright registrations for these works.  *Id.* ¶¶ 23–24; Doc. 1-1 (copyright registration certificates).  *Fortnite* includes the popular "Battle Royale" game that drops a maximum of 100 players into a large map where players battle each other until only one player or team remains.  Compl. ¶ 17.  Success in "Battle Royale" is often determined by a player's skill level, including their ability to use their controller to maneuver their character, maintain awareness of their surroundings, and aim at their target quickly and accurately.  *Id.* ¶ 18.  Epic offers *Fortnite* tournaments, including competitive tournaments with cash prizes, that allow players to test their skills.  *Id.* ¶ 20.

Epic invests substantial effort in the design and maintenance of *Fortnite* to ensure a fair playing field for all players, and expressly prohibits the use of cheat software in its agreements with *Fortnite* players, including but not limited to its *Fortnite* End User License Agreement ("EULA") and its agreements with all participants in each of its *Fortnite* tournaments (the "Tournament Agreements"). *Id.* ¶¶ 19, 25–32.  For example, under the *Fortnite* EULA, a player may not "create, develop, distribute, or use any unauthorized software programs to gain advantage in any online or other game modes," nor may a player "behave in a manner which is detrimental to the enjoyment of [*Fortnite*] by other users as intended by Epic, in Epic's sole judgment, including but not limited to . . . running or using methods which are not authorized by Epic and which interfere with the outcome and/or the

180389829.10

course of [*Fortnite*], (including Cheats . . . ) by giving you and/or another user an advantage over other users who do not use such methods . . . ."  *Id.* ¶ 29; Doc. 1-1 at 32.  Similarly, the Tournament Agreements prohibit "[u]sing any kind of cheating device, program, or similar cheating method to gain a competitive advantage."  Compl. ¶ 32; *see, e.g.*, Doc. 1-1 at 63.  Anyone who plays *Fortnite* must agree to the *Fortnite* EULA, and anyone who participates in a *Fortnite* tournament must agree to abide by the corresponding Tournament Agreement, including Defendant.  Compl. ¶¶ 27, 32, 37, 60, 61.

Epic also regularly implements and updates technological measures designed to prevent individuals from using cheat software in *Fortnite* and bans players that use cheat software in *Fortnite*.  *Id.* ¶¶ 22, 33–36.  Any player that downloads *Fortnite* also downloads Epic's cheat detection software, which restricts a user's access to *Fortnite*.  *Id.* ¶ 34.  When the cheat detection software detects cheat software on a player's computer, the player is prevented from launching *Fortnite*, viewing the *Fortnite* audiovisual displays, or otherwise accessing or using *Fortnite*.  *Id.* ¶¶ 34–35.  Epic also uses hardware ID bans against players previously identified as using cheat software in *Fortnite*, which prevents that user from using their hardware (i.e., computer) to launch or use *Fortnite*.  *Id.* ¶ 36.

## B.    Defendant's Unlawful Acts

Defendant repeatedly used cheat software while playing in over a dozen different *Fortnite* tournaments between June and October 2024 in order to illicitly earn thousands of dollars in prize money.  Epic first detected Defendant using a "direct memory access" ("DMA") device on his computer while playing *Fortnite* on June 5, 2024.  *Id.* ¶ 38.  A DMA cheat, which is used in conjunction with a DMA device, is specifically designed and used to avoid Epic's anti-cheat technological protection measures.  *Id.* ¶ 40.  While most cheats need to be loaded onto the same computer on which the target game is running to work, a DMA cheat uses two computers—one that runs the game (here, *Fortnite*), and another that runs

1    the cheat.  *Id.* ¶ 41–42.  The DMA device connects to both computers and serves as

2    the middleman for the two: it reads the *Fortnite* memory running on the game

3    computer and transmits a copy to the cheat computer.  *Id.* ¶ 42.  The primary

4    purpose of this dual computer setup is to avoid detection by Epic's anti-cheat

5    measures, which can check only the computer on which *Fortnite* is loaded for cheat

6    software, not the other computer.  *Id.* ¶ 43.

7          Defendant obtained multiple unfair competitive advantages by using the

8    DMA cheat software in *Fortnite* tournaments.  One such advantage is called extra-

9    sensory perception ("ESP"), which allows cheating players to see the location of

10   other players and items through solid objects (*e.g.*, walls) that are ordinarily hidden

11   from non-cheating players.  *Id.* ¶¶ 6, 44.  Another type of cheat used to gain an

12   unfair advantage is "aimbot," where the cheat software takes control of the cheating

13   player's keyboard and mouse inputs and, using information gleaned from *Fortnite*'s

14   memory, can automatically aim at other players with perfect accuracy.  *Id.* ¶ 45.

15   Players that do not use cheat software have to develop and use aiming skills to hit

16   their targets with their mouse and keyboard.  *Id.*  DMA cheat software is able to

17   access this ordinarily hidden information (*e.g.*, player and item location through

18   solid walls) because the cheat software contains copied portions of Epic's

19   copyright-protected *Fortnite* software code.  *Id.* ¶ 46.

20         After Epic first detected Defendant's use of a DMA device while playing in a

21   *Fortnite* tournament, it banned Defendant's account from playing *Fortnite* on

22   June 6, 2024.  *Id.* ¶ 38.  But Defendant was undeterred.  Defendant then started

23   creating alternative *Fortnite* accounts to continue using a DMA device and cheats

24   in *Fortnite* tournaments.  *Id.* ¶ 39.  Attempting to disguise his activities, he used

25   fake names and other personal information in connection with these alternative

26   accounts and used hardware ID spoofers to alter the appearance of the serial

27   numbers on his devices, avoiding Epic's hardware ID bans against his computer.

28   *Id.* ¶ 47.  Using his fake accounts, and despite previously being banned for

-5-

2:24-CV-10835-DDP-JC

cheating, Epic is aware of at least 18 different *Fortnite* tournaments Defendant entered into between June 10 and October 6, 2024, each time agreeing to be bound by the applicable Tournament Agreements. *Id.* ¶ 61. However, because Defendant defaulted, he deprived Epic of the ability to discover the extent of his cheating, and given Defendant's use of fake accounts, the true scope of his cheating is not known.

## C.    Defendant Harmed Epic

As a result of Defendant's cheating in competitive *Fortnite* tournaments, and his continuing to do so through fraud, Epic and the *Fortnite* community have suffered substantial harm. As a result of Defendant's use of a DMA device and cheats in *Fortnite*, Epic is aware of at least $6,850 in tournament prize money that has been paid out to Defendant. Brews Decl. ¶ 8. The total winnings actually paid out to Defendant is likely larger, given his frequent circumvention of Epic's detection measures, and cannot be known by Epic because Defendant failed to appear in this action. Epic also expended significant resources investigating and combatting Defendant's cheating and fraud, including time spent investigating cheating reports from other *Fortnite* players that encountered Defendant in tournaments and subsequently analyzing Defendant's gameplay telemetry and history, time spent identifying other possible fake accounts created by Defendant using false names and other personal information, confirming Defendant's identity, and implementing bans against those accounts. *Id.* ¶¶ 5–11. Moreover, Defendant's cheating has harmed Epic's goodwill with the *Fortnite* community and undermined the integrity of *Fortnite* tournaments causing non-cheating players to stop playing *Fortnite*. *Id.* ¶ 12.

## D.    Procedural History

Epic filed its complaint against Defendant on December 16, 2024. Doc. No. 1. Epic made multiple attempts to effect service, and on January 7, 2025, Epic's counsel received a phone call from an attorney who said he was representing Defendant in this matter. Dugdale Decl. ¶ 2. On January 9, 2025, Epic's counsel

1  emailed Defendant's counsel a copy of the Summons, Complaint, and Notice and

2  Acknowledgement of Receipt of Summons and Complaint, and mailed a copy of

3  the same to Defendant's counsel's business address.  *Id.*  On February 10, 2025,

4  Defendant's counsel returned a signed copy of the Notice and Acknowledgement of

5  Receipt of Summons and Complaint, which was then filed the same day.  Doc.

6  No. 14.  On February 12, 2025, Epic's counsel sent Defendant's counsel a copy of

7  the e-filing notification for the Notice and Acknowledgement of Receipt of

8  Summons and Complaint, which indicated that the response deadline was March 3,

9  2025.  Dugdale Decl. ¶ 5.  After Defendant failed to respond to the Complaint by

10  the March 3 deadline, on March 4, 2025 Epic's counsel emailed Defendant's

11  counsel regarding the missed deadline, and Defendant's counsel replied that

12  Defendant's response would be filed on March 5, 2025.  *Id.* ¶ 6.  Having received

13  no response to the Complaint, Epic filed a request for entry of default to the clerk

14  on March 7, 2025.  Doc. No. 15.  The clerk entered default against Defendant the

15  same day.  Doc. No. 16.  On March 10, 2025, Epic's counsel emailed a copy of the

16  clerk's entry of default to Defendant's counsel.  Dugdale Decl. ¶ 7.  On March 19,

17  2025, Defendant's counsel contacted Epic's counsel to inquire whether Epic would

18  stipulate to set aside the default.  *Id.*  Epic's counsel responded, leaving a voicemail

19  on March 21 that given the lack of any defenses, Epic would not agree.  *Id.*  Epic's

20  counsel confirmed the same over email on March 24.  *Id.*, Ex. 1.  As of the date of

21  this filing, counsel has not contacted Epic's counsel or filed a motion to set aside

22  the default.  *Id.* ¶ 8.

23  ### III.    ARGUMENT

24      The Clerk having entered default, Epic now moves for default judgment

25  pursuant to Fed. R. Civ. P. 55(b)(2).  To obtain default judgment in this District, a

26  plaintiff must satisfy the procedural requirements of Local Rule 55-1 and show that

27  default judgment is warranted by the Court's weighing of the Ninth Circuit's

28  factors under *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).  Here, Epic

has met both the procedural and substantive requirements to obtain default judgment, and requests a monetary judgment of $267,800 as well as an award of attorneys' fees of $8,956 and a permanent injunction against Defendant.

**A.    Epic Has Satisfied the Local Rule 55-1 Procedural Requirements**

Under Local Rule 55-1, an application for default judgment under Fed. R. Civ. P. 55(b)(2) must include a declaration stating (a) when and against what party the default was entered, (b) the identification of the pleading to which default was entered, (c) whether the defaulting party is an infant or incompetent person, (d) that the Servicemembers Civil Relief Act (50 U.S.C. App. § 521) does not apply, and (e) that notice has been served on the defaulting party, if required by Fed. R. Civ. P. 55(b)(2).

Default was entered on March 7, 2025 against Defendant Sebastian Araujo with respect to the Complaint (Doc. No. 1) in this action.  Dugdale Decl. ¶ 9. Defendant is not an infant or incompetent person, nor does the Servicemembers Civil Relief Act apply to Defendant.  *Id.*  Neither Defendant nor his counsel has filed an appearance in this action, and so notice of this application need not be served on Defendant.[1]  *Id.*  However, courtesy copies have been sent to counsel.  *Id.*

**B.    The *Eitel* Factors Weigh In Favor of Default Judgment**

Courts in the Ninth Circuit consider the following factors when deciding whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel*, 782 F.2d at 1471–72; *E.I. Du Pont de Nemours and Co. v. Drabek*, No. CV

---

[1] Even so, Defendant's counsel was notified of Epic's intent to file a motion for default judgment on March 24, 2025.  Dugdale Decl. ¶ 7, Ex. 1.  Defendant's counsel did not respond.  *Id.* ¶ 8.

-8-

12-10574 DDP (AJWx), 2013 WL 4033630, at *3 (C.D. Cal. May 3, 2013) (applying the *Eitel* factors). "In applying this discretionary standard, default judgments are more often granted than denied." *PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999). Here, each of the *Eitel* factors weigh strongly in favor of default judgment.

### 1.    Epic Will Be Prejudiced

Epic would suffer prejudice without the default judgment. Because Defendant has not appeared in this case, default judgment is the only means Epic has to recover for Defendant's wrongful acts. *Blizzard Entm't, Inc. v. Bossland GmbH*, No. SA CV 16-1236-DOC (KESx), 2017 WL 780660, at *3 (C.D. Cal. Mar. 31, 2017). Additionally, without default judgment, "Defendant will have avoided liability simply by not responding to [Epic's] action." *Sony Interactive Entm't LLC v. Scales*, No. EDCV 18-2141 JGB (KKx), 2019 WL 13065920, at *3 (C.D. Cal. Mar. 18, 2019). The first *Eitel* factor therefore weighs in favor of default judgment.

### 2.    Epic Has Sufficiently Pled Meritorious Claims

Courts often consider the second and third *Eitel* factors together, which look to the substantive merit of the plaintiff's complaint and the sufficiency of its pleadings. *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002); *Landstar Ranger, Inc. v. Path Enters., Inc.*, 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010). After a clerk's entry of default, the court takes all well-pleaded factual allegations in the complaint regarding liability as true. *TeleVideo Sys, Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987); *E.I. Du Pont de Nemours and Co.*, 2013 WL 4033630, at *5. "To warrant default judgment, the allegations in the [c]omplaint must be sufficient to state a claim upon which [p]laintiff can recover." *E.I. Du Pont de Nemours and Co.*, 2013 WL 4033630, at *4 (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)). Epic has sufficiently pled each of its four claims against Defendant.

180389829.10

2:24-CV-10835-DDP-JC

### a.    Circumvention of Technological Measures

To plead a claim under the anti-circumvention provision of the DMCA, a plaintiff must plead that (1) it employs technological measures that effectively control access to a work protected by copyright, and (2) defendant circumvented those measures.  17 U.S.C. § 1201(a)(1)(A); *Disney Enters., Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d 708, 714 (C.D. Cal. 2019).

Epic has obtained federal copyright registrations for *Fortnite* as both software code and audiovisual works.  Compl. ¶¶ 23–24; Doc. No. 1-1 p. 1 (copyright registration certificates).  These certificates of registration are prima facie evidence of copyright validity.  *Sony Interactive Entm't*, 2019 WL 13065920, at *4.  Epic's anti-cheat software and hardware ID bans are both technological measures that effectively control access to *Fortnite*.  Compl. ¶¶ 34–36.  A player detected by Epic's anti-cheat software is not permitted to view the audiovisual displays of, launch, or otherwise use or access *Fortnite*.  *Id.* ¶ 34.  Similarly, a player subject to a hardware ID ban is prevented from launching, using, or accessing *Fortnite*.  *Id.* ¶ 36.

Defendant circumvented both of these technological measures.  First, Defendant circumvented Epic's anti-cheat measures by using cheat software and additional hardware and devices which allows Defendant to use cheat software for *Fortnite* on a separate computer from the computer running *Fortnite*, thereby avoiding detection by Epic's anti-cheat.  *Id.* ¶¶ 42–43, 52.  Second, when Epic detected Defendant's cheating, it implemented hardware ID bans on Defendant's devices used to play *Fortnite*, but Defendant circumvented Epic's hardware ID ban by using hardware ID spoofers to alter the appearance of the serial numbers on his devices, which Epic uses to enforce its hardware ID bans.  *Id.* ¶¶ 47–49, 52. Accordingly, Epic has alleged facts sufficient to state a claim under the DMCA anti-circumvention provisions.

### b.    Breach of Contract

"A claim for breach of contract is comprised of a contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and the resulting damages to plaintiff." *Yelp, Inc. v. Catron*, 7 F. Supp. 3d 1082, 1099 (N.D. Cal. 2014); *see also Facebook, Inc. v. Sahinturk*, No. 20-cv-08153-JSC, 2022 WL 1304471, at *8 (N.D. Cal. May 2, 2022).

Both the *Fortnite* EULA and the Tournament Agreements constitute contracts between Defendant and Epic.  When Defendant downloaded and played *Fortnite*, he agreed to be bound by the *Fortnite* EULA.  Compl. ¶¶ 26–27, 37, 60; Doc. No. 1-1 p. 31 (*Fortnite* EULA).  Defendant also participated in at least 18 *Fortnite* tournaments while using DMA cheat software, and accepted and agreed to be bound by the applicable Tournament Agreements.  Compl. ¶¶ 37, 61; Doc. No. 1-1 p. 52 (applicable Tournament Agreements).  Epic performed its obligations under both the *Fortnite* EULA and Tournament Agreements, permitting Defendant to access *Fortnite* and participate in the *Fortnite* tournaments.  Compl. ¶¶ 37–39, 58–61, 63.  The *Fortnite* EULA and Tournament Agreements prohibit, among other things:

- "remov[ing], disable[ing], circumvent[ing], or modify[ing] any…security technology included in [*Fortnite*];"
- "us[ing] any unauthorized software programs to gain advantage in any online or other game modes;"
- "behav[ing] in a manner which is detrimental to the enjoyment of [*Fortnite*] by other users as intended by Epic, in Epic's sole judgment, including but not limited to…running or using methods which are not authorized by Epic and which interfere with the outcome and/or course of [*Fortnite*], (including Cheats, bots, scripts, or mods not expressly authorized by Epic) by giving you and/or another user an advantage over other users who do not use such methods;" and

-11-

- • "[u]sing any kind of cheating device, program, or similar cheating method to gain a competitive advantage."

Compl. ¶¶ 29, 32; Doc. No. 1-1 p. 32, 63.

Defendant's use of DMA cheat software in *Fortnite* tournaments breached each of these terms.  Most importantly, the DMA cheat software that Defendant used gave him a significant advantage in *Fortnite*'s online tournaments against non-cheating players, allowing Defendant to see information ordinarily hidden from non-cheating players, like the location of other players and items (so-called "extra sensory perception" or "ESP") and the ability to automatically aim at other players with perfect accuracy and without requiring any input from the cheating player ("aimbot").  Compl. ¶¶ 44–45.  The DMA device and cheat software that Defendant used also circumvents Epic's security measures for *Fortnite*, and the hardware ID spoofers that he employed also circumvented different security measures.  Compl. ¶¶ 43, 47, 52.

Defendant's conduct harmed Epic and the *Fortnite* community in significant ways, including by fraudulently winning at least $6,850 in competitive *Fortnite* tournaments that he should not have earned, causing Epic to incur costs investigating and combatting his cheating, and incalculable harm to Epic's goodwill and reputation for providing a fair and level playing field in its *Fortnite* tournaments, driving players away from *Fortnite* and causing those players to no longer purchase in-game passes, cosmetics, and related items.  Compl. ¶¶ 65–71; Brews Decl. ¶¶ 5–12.

Default judgment should therefore be entered against Defendant for breach of contract.

### c.    Copyright Infringement

A plaintiff must plead two elements to state a claim for copyright infringement: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.  *Disney Enters., Inc. v. VidAngel, Inc.*,

-12-

869 F.3d 848, 856 (9th Cir. 2017); *Blizzard Entm't*, 2017 WL 7806600, at \*4 (granting motion for default judgment against video game hack developer).

As discussed above, the first element is satisfied by Epic's copyright registrations for the software code of *Fortnite*. Compl. ¶¶ 23–24; Doc. No. 1-1 p. 1 (copyright registration certificates); *Sony Interactive Entm't*, 2019 WL 13065920, at \*3. In order for Defendant's DMA cheat to operate in connection with *Fortnite*, that cheat software contains copied portions of Epic's *Fortnite* software code. Compl. ¶ 46. Every time Defendant used the DMA cheat, a copy of the cheat software code—which includes the copied portions of the *Fortnite* code—is created. *Id.*; *see MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, at 518 (9th Cir. 1993) ("'copying' for purposes of copyright law occurs when a computer program is transferred from a permanent storage device to a computer's RAM"). Accordingly, by using the cheat software, Defendant copied Epic's copyright protected code and Default judgment should be entered against Defendant on Epic's copyright infringement claim. *Blizzard Entm't*, 2017 WL 7806600, at \*4 (granting default judgment on copyright infringement claim where copying of video game code was required to create or maintain defendant's hacking software).

### d.    Fraud in the Inducement

To state a claim for fraud in the inducement, a plaintiff must allege "(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Stephen Gould Corp. v. Osceola*, No. 2:22-cv-08347-WLH-AGR, 2023 WL 8254483, at \*4 (C.D. Cal. Oct. 13, 2023) (citing *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 906 (N.D. Cal. 2011)). While fraud claims must be pled with particularity, "intent" and "knowledge" elements—which describe "conditions of a person's mind"—are not subject to this heightened pleading standard and may instead be pled generally through circumstantial evidence, including allegations describing defendants' conduct. Fed. R. Civ. P.

-13-

2:24-CV-10835-DDP-JC

1    9(b); *see also Hosp. Mktg. Concepts, LLC v. Six Continents Hotels, Inc.*, No. SACV

2    15-01791, 2016 WL 9045621, at \*6 (C.D. Cal. Jan. 28, 2016) (citing *Manta v.*

3    *Chertoff*, 518 F.3d 1134, 1142 (9th Cir. 2008)).

4           On June 6, 2024, Defendant was banned from *Fortnite* for cheating in

5    *Fortnite* tournaments.  Compl. ¶¶ 38, 58.  Defendant then created new accounts

6    after he was banned on June 21, June 25, and July 29, 2024, each time

7    misrepresenting and concealing his identity by providing false and misleading

8    personal information.  *Id.* ¶ 59.  Defendant also misrepresented his intent to comply

9    with the *Fortnite* EULA and Tournament Agreements that prohibited cheating in

10   *Fortnite* and *Fortnite* tournaments each time he accepted those agreements.  *Id.*

11   ¶¶ 60–62 (specifying the dates on which Defendant agreed to those contracts).

12   Defendant knew the identifying information he provided in connection with the

13   accounts was false and also knew that he had no intention of complying with the

14   contracts to which he had agreed, as evidenced by the fact that he used the newly

15   created accounts to continue to cheat in *Fortnite* tournaments in violation of those

16   agreements.  *Id.* ¶¶ 39, 47–48, 59–61.  Defendant intended to induce Epic's reliance

17   on his misrepresentations because he was aware that if he provided accurate

18   identifying information, Epic would not have permitted him to create new accounts

19   and access *Fortnite*.  *Id.* ¶ 64.

20          Epic relied on Defendant's misrepresentations to unknowingly grant

21   Defendant access to *Fortnite*, and its reliance was justified because Defendant took

22   steps to conceal his identity.  *Id.*¶ 63.  Had Epic known that Defendant was creating

23   these accounts, Epic would not have permitted Defendant to do so and would not

24   have granted Defendant access to *Fortnite*.  *Id.*  Epic was subsequently harmed

25   when Defendant accessed and cheated in *Fortnite* tournaments.  *Id.* ¶¶ 65–71.  Epic

26   has thus stated a claim for fraud in the inducement.  *See, e.g.*, *Parino*, 838 F. Supp.

27   2d at 906; *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164,

28   1178–79 (C.D. Cal. 2018) (denying motion to dismiss fraud in the inducement

-14-

1    claim based on defendants' representation that they would comply with plaintiff's

2    Terms of Use, given that defendants went on to breach the Terms of Use).

3         **3.      The Remaining *Eitel* Factors Strongly Favor Default Judgment**

4         Each of the remaining *Eitel* factors weigh in Epic's favor.

5         "The fourth *Eitel* factor examines the amount of money at stake in relation to

6    the seriousness of defendant's conduct," and supports default judgment where the

7    relief sought by the plaintiff is consistent with the allegations in the complaint and

8    the claims asserted.  *E.I. Du Pont de Nemours and Co.*, 2013 WL 4033630, at *5

9    (quoting *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1060 (N.D.

10   Cal. 2010)).  That is the case here, where Defendant defrauded Epic and

11   undermined the integrity of *Fortnite* tournaments, and then failed to participate in

12   this litigation after being sued.  So Epic seeks recovery of statutory damages and

13   injunctive relief authorized by applicable statute.

14        The fifth *Eitel* factor considers whether there is likely a dispute concerning

15   material facts, and a dispute is unlikely where the plaintiff has filed a well-pleaded

16   complaint and the defendant makes no effort to respond.  *E.I. Du Pont de Nemours

17   and Co.*, 2013 WL 4033630, at *5; *Blizzard Entm't*, 2017 WL 7806600, at *7.

18   Epic's complaint is well-pled, and Defendant has failed to respond, despite Epic's

19   best efforts.  *See supra* Section III.B.2.

20        The sixth *Eitel* factor—possibility of excusable neglect resulting in

21   defendant's default—is highly unlikely here where Defendant has actual notice of

22   the lawsuit, having been properly served with the summons and complaint and

23   retained counsel to acknowledge and accept service, but has failed to respond to the

24   complaint.  Doc. No. 14 (Defendant's Notice and Acknowledgement of Service);

25   *Craigslist*, 694 F. Supp. 2d at 1061 ("Plaintiff has proffered evidence showing

26   Defendants were clearly aware of the pending litigation.").

27        As to the final *Eitel* factor, "[n]otwithstanding the strong policy presumption

28

-15-

1  in favor of a decision on the merits, where a defendant fails to appear and respond

2  as occurred here, a decision on the merits is impossible and default judgment is

3  appropriate." *E.I. Du Pont de Nemours and Co.*, 2013 WL 4033630, at *6; *Sony*

4  *Interactive Entm't*, 2019 WL 13065920, at *6.

5       Accordingly, each of the seven *Eitel* factors weigh in favor of default

6  judgment against Defendant.

7       ### C.    Epic Is Entitled to Monetary Recovery

8       Having established that Defendant is liable on each of Epic's claims, Epic

9  must now prove damages. While Epic's allegations in the complaint as to liability

10  are accepted as true, Epic must "prove up" the amount of damages. *Sony*

11  *Interactive Entm't*, 2019 WL 13065920, at *6 (quoting *Aifang v. Velocity VIII L.P.*,

12  No. CV 14-07060 SJO (MRWx), 2016 WL 4520641, at *7 (C.D. Cal. Sept. 26,

13  2016)).

14       Here, Epic elects to recover statutory damages for its DMCA and copyright

15  infringement claims. 17 U.S.C. § 1203(c); 17 U.S.C. § 504(c). Statutory damages

16  are especially appropriate in default judgment cases "since it is difficult to prove

17  actual damages . . . due to defendant's absence in the proceedings." *Microsoft*

18  *Corp. v. BH Tech, Inc.*, No. 2:16-cv-2664-ODW-RAO, 2016 WL 8732074, at *6

19  (C.D. Cal. Sept. 2, 2016); *see also Warner Bros. Entm't Inc. v. Caridi*, 346 F. Supp.

20  2d 1068, 1074 (C.D. Cal. 2004) ("Indeed, statutory damages are particularly

21  appropriate in a case, such as this one in which the defendant has failed to mount

22  any defense or to participate in discovery, thereby increasing the difficulty of

23  ascertaining plaintiff's actual damages."). Under the DMCA, a plaintiff may

24  recover statutory damages of "not less than $200 or more than $2,500 per act of

25  circumvention . . . as the court considers just." 17 U.S.C. § 1203(c)(3)(A). The

26  Copyright Act provides that a plaintiff may ordinarily recover "a sum of not less

27  than $750 or more than $30,000" per infringed work, and where the infringement is

28  willful, up to $150,000 per infringed work. 17 U.S.C. § 504(c)(1)–(2).

-16-

1      Where, as here, the plaintiff has alleged that the defendant's conduct was
2  willful, the allegation "is deemed true due to defendant's default."  *Starbucks Corp.*
3  *v. Heller*, No. CV 14-01383 MMM (MRWx), 2015 WL 13919137, at *19 (C.D.
4  Cal. May 28, 2015); Compl. ¶¶ 78, 99.  Epic's factual allegations similarly support
5  a willfulness finding.  Defendant knew that cheating was prohibited in *Fortnite* and
6  by each of the Tournament Agreements.  Compl. ¶ 37.  He cheated anyway—
7  repeatedly.  Compl. ¶¶ 38–47.  He cheated even though he was banned for cheating,
8  used tools and fraud to circumvent Epic's bans, and used software that infringes
9  Epic's copyrights to do so.  Compl. ¶¶ 46–53.  Thus, Epic is entitled to recover up
10  to $2,500 per circumvention by Defendant and up to $150,000 for each copyright
11  that Defendant willfully infringed.

12      The court has wide discretion in determining the amount of statutory
13  damages to award under both the DMCA and Copyright Act.  *VBConversions LLC*
14  *v. Gulf Coast Ventures, Inc.*, No. CV 12-8265 JGB (ARGx), 2016 WL 11687660, at
15  *7 (C.D. Cal. Aug. 10, 2016).  Among other factors, the court may consider the
16  deterrent effect of the award on defendant and on third parties, particularly where
17  the defendant has profited from his infringement or circumvention.  *Starbucks*
18  *Corp.*, 2015 WL 13919137, at *20; *VBConversions*, 2016 WL 11687660, at *8
19  ("Because [defendant] profited from the circumventions, the award of statutory
20  damages against it should operate to deter [defendant] from encouraging its
21  employees to infringe copyrighted software.").

22      Although Epic detected Defendant's use of a DMA device while playing
23  *Fortnite*, it is impossible to know the true scope of Defendant's cheating activities
24  because the DMA device and cheat software are designed to avoid Epic's anti-cheat
25  technological protection measures.  Brews Decl. ¶ 4.  Defendant took measures to
26  conceal his identity when playing *Fortnite*, including the creation of fake accounts
27  using fraudulent identifying information and the use of hardware ID spoofers to
28  disguise his device from Epic's hardware ID bans.  Compl. ¶¶ 47–48, 58–61, 76.

-17-

1  Thus, the true scope of Defendant's circumvention—and the total amount of

2  tournament winnings wrongfully earned as a result—remains unknown to Epic.

3  Brews Decl. ¶ 4.  Defendant's refusal to participate in these proceedings should not

4  shield him from liability and damages for his unlawful actions, nor should it

5  prejudice Epic's ability to defend the integrity of its *Fortnite* tournaments for all of

6  their participants.

7        Epic's investigation into Defendant's *Fortnite* tournament activity before and

8  after it detected him using DMA device and banning him for cheating in June 2024

9  shows the scope of his cheating was substantial.  Epic has analyzed accounts it was

10 able to trace to Defendant.  Before Defendant started using a DMA device, from

11 September 6, 2022 through June 18, 2024—Defendant participated in

12 1,033 *Fortnite* tournament matches, played almost exclusively on a console device

13 (e.g., Xbox or Playstation), and was paid out tournament winnings 6 times, winning

14 only a few hundred dollars.  Brews Decl. ¶ 6.  Around the time Epic detected

15 Defendant using a DMA device, Defendant's play style suddenly changed.  *Id.*

16 ¶¶ 7–8.  He started playing primarily on a PC—DMA cheats are used on PCs and

17 cannot be used on consoles.  *Id.* ¶ 8.  And Defendant began winning money.  In less

18 than four months, between June 19 and October 11, 2024, Defendant participated in

19 at least 839 *Fortnite* tournament matches and earned tournament winnings at least

20 36 times for a combined total of at least $6,850 in tournament winnings.  *Id.*

21 Additionally, during that same four-month period, Epic received 991 reports that

22 Defendant was using cheat software from other *Fortnite* players that played against

23 Defendant.  *Id.* ¶ 9.  Based on Epic's analysis, Epic believes that Defendant used

24 DMA cheat software in each of the 839 *Fortnite* tournament matches he

25 participated in from June 19 through October 11, 2024, circumventing Epic's anti-

26 cheat measures to do so.  *Id.* ¶ 10.  The number is likely much higher, given

27 Defendant's use of fake accounts and hardware spoofers to disguise his identity.  *Id.*

28        Accordingly, Epic requests an award of the DMCA statutory minimum of

-18-

$200 for each of the 839 matches in which he likely used DMA cheat software for a total of $167,800 in DMCA statutory damages.  Epic further requests $100,000 in statutory damages for Defendant's willful infringement of Epic's *Fortnite* copyright, for a total statutory award of $267,800.  Epic's request is well below the maximum statutory damages award of $2,247,500 that it could seek under the DMCA and the Copyright Act, and also within the statutory awards granted in other cases in the Ninth Circuit.  *Bungie, Inc. v. Bansal*, No. 2:21-cv-01111-TL, 2023 WL 3309496, at *7 (W.D. Wash. May 8, 2023) (awarding $2,000 per DMCA violation and $150,000 per copyrighted work infringed in video game cheat software case for willful violations); *VBConversions*, 2016 WL 11687660, at *8 (awarding $1,200 per DMCA circumvention and $100,000 per copyright for willful infringement).

### D.    Epic Is Entitled to Recover its Attorneys' Fees and Costs

Both the DMCA and Copyright Act authorize the Court to award Epic its reasonable costs and attorneys' fees.  17 U.S.C. §§ 505, 1203(b)(4).  "The DMCA authorizes a court, in its discretion, to allow recovery of costs and to award reasonable attorney's fees to the prevailing party."  *Sony Comput. Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 967 (N.D. Cal. 2006).  Courts routinely award attorneys' fees in DMCA cases where, as here, defendant has defaulted and his conduct was willful.  *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1065 (N.D. Cal. 2010); *Divineo*, 457 F. Supp. 2d at 967.  Under the Copyright Act, a court may "freely award fees" to the prevailing party as long as it "seek[s] to promote the Copyright Act's objectives."  *Historical Research v. Cabral*, 80 F.3d 377, 378–79 (9th Cir. 1996) (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)).  Courts may consider several nonexclusive factors when determining whether to award fees, including "(1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) objective unreasonableness (both in the factual and legal arguments in the case); and (5) the need in particular

-19-

1   circumstances to advance considerations of compensation and deterrence." *Bungie,*

2   *Inc. v. Claudiu-Florentin*, No. 2:21-cv-01114-TL, 2023 WL 3158585, at *5 (W.D.

3   Wash. Apr. 27, 2023) (quoting *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547

4   F.3d 1213, 1230 (9th Cir. 2008)).

5        Here, an award of fees is warranted where Defendant's circumvention of

6   Epic's anti-cheat measures and infringement of Epic's copyrights was repeated and

7   willful.  Compl. ¶¶ 47–52, 78, 99.  As demonstrated above, Epic will prevail

8   completely on all of its claims against Defendant.  *See supra* Section III.B.2.

9   Defendant's failure to appear and defend this matter—despite multiple contacts

10  with his counsel and claims that an answer and/or motion to set aside default was

11  forthcoming—evidences his frivolousness and objectively unreasonable approach

12  to this case.  Defendant's motivations for infringing Epic's copyrights were purely

13  self-interested and malicious, seeking to profit individually and unfairly against

14  non-cheating *Fortnite* players, and infringing Epic's copyrights to do so.  And the

15  interests of compensation and deterrence would both be served by an award of

16  attorneys' fees to deter future cheating conduct in *Fortnite*.

17       Using the table found in Local Rule 55-3[2] along with the amount of statutory

18  damages sought by Epic ($267,800), Epic seeks fees in the amount of $8,956.

19       **E.    Epic Is Entitled to a Permanent Injunction**

20       In addition to monetary relief, Epic is entitled to a permanent injunction to

21  prevent Defendant from cheating in *Fortnite* in the future.  Injunctive relief is an

22  equitable remedy, and district courts therefore have broad discretion to impose such

23  relief and craft the scope of an injunction to the particular facts of the case.  *See*

24  *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 953 (N.D. Cal. 2009).  The

25  DMCA authorizes injunctive relief "to prevent or restrain a violation" of the

26  DMCA, while the Copyright Act permits courts to issue "final injunctions on such

27  terms as it may deem reasonable to prevent or restrain infringement of a copyright."

28

---

[2] Local Rule 55-3 provides for $5,600 plus 2% of the amount over $100,000.

17 U.S.C. §§ 502(a), 1203(b)(1).  In deciding whether to issue a permanent injunction, courts consider whether: (1) plaintiff has suffered irreparable injury, (2) "remedies at law, such as monetary damages, are inadequate to compensate for that injury," (3) in light of "the balance of hardships between plaintiff and defendant, a remedy in equity is warranted," and (4) a permanent injunction is in the public's interest.  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Each of these factors favor entry of a permanent injunction here.  Epic has suffered, and will continue to suffer, irreparable injury to its goodwill and the *Fortnite* community, especially the competitive community that participates in *Fortnite* tournaments, if Defendant is not permanently enjoined from cheating in *Fortnite*.  Brews Decl. ¶ 12.  Epic received over 900 complaints centered on Defendant's cheating from non-cheating players, and those complaints would only continue if Defendant's cheating—and evasion of Epic's anti-cheat measures while doing so—continued.  *Id.* ¶ 9.  There is no adequate remedy at law because monetary relief will not enable Epic to remedy the goodwill it has lost as a result of Defendant's cheating.  Further, because Defendant has not appeared in the case, there can be no assurances that Defendant will stop cheating absent injunctive relief.  *Bungie*, 2023 WL 3309496, at *8.  The balance of hardships also favors Epic because Defendant would only be prohibited from violating the DMCA and infringing Epic's copyrights in the future.  *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135–36 (9th Cir. 1986) (stating that "[i]f the defendants sincerely intend not to infringe, the injunction harms them little"); *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1084 (C.D. Cal. 2012) ("the balance of hardships favors Plaintiff because without an injunction, Plaintiff will lose profits and goodwill, while an injunction will only proscribe Defendants' infringing activities.").  Finally, "the public interest is served when copyright law protections are enforced."  *Blizzard Entm't*, 2017 WL 7806600, at*9; *see also Sony Interactive Entm't*, 2019 WL 13065920, at *7.

1       Accordingly, Epic asks the Court to enter the accompanying proposed

2   permanent injunction to prevent any future DMCA violations or copyright

3   infringements by Defendant.

4   **IV.    CONCLUSION**

5       For the foregoing reasons, Epic respectfully requests that the Court grant its

6   motion for default judgment in its favor against Defendant and award the following

7   remedies to Epic: (1) statutory damages of $167,800 pursuant to the DMCA;

8   (2) statutory damages of $100,000 pursuant to the Copyright Act; (3) award of

9   attorneys' fees and costs in the amount of $8,950; and (4) enter a permanent

10  injunction against Defendant in the form provided.

11

12  Dated:  April 25, 2025                    **PERKINS COIE LLP**

13

14                                            By: */s/Katherine M. Dugdale*

15                                            Katherine M. Dugdale, Bar No. 168014

16                                            Christian W. Marcelo, Bar No. 51193
                                              Jacob P. Dini, Bar No. 54115

17

18

19

20

21

22

23

24

25

26

27

28

2:24-CV-10835-DDP-JC