UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 24-10835-KK-JCx | Date: | June 24, 2025 |
|---|---|---|---|
| Title: | *Epic Games Inc. v. Sebastian Araujo* | | |

Present: The Honorable   KENLY KIYA KATO, UNITED STATES DISTRICT JUDGE

| Noe Ponce | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   (In Chambers) Order GRANTING Plaintiff's Motion for Default Judgment [Dkt. 18]

## I.
## INTRODUCTION

On December 16, 2024, plaintiff Epic Games Inc. ("Plaintiff") filed the operative Complaint against defendant Sebastian Araujo ("Defendant"), asserting claims arising from Defendant's alleged use of "cheat software" in the game, Fortnite, in violation of copyright law and breaching contractual agreements. ECF Docket No. ("Dkt.") 1, Complaint ("Compl."). Defendant has not made an appearance in this matter. Hence, on April 25, 2025, following the entry of default by the Clerk of the Court, dkt. 16, Plaintiff filed the instant Motion for Default Judgment ("Motion"). Dkt. 18, Motion ("Mot.").

The Court finds this matter appropriate for resolution without oral argument. See Fed. R. Civ. P. 78(b); L.R. 7-15. For the reasons set forth below, Plaintiff's Motion is **GRANTED**.

## II.
## BACKGROUND

**A.   PROCEDURAL HISTORY**

On December 16, 2024, Plaintiff filed a Complaint against Defendant for allegedly violating copyright law and breaching contractual agreements by using "cheat software" in the game Fortnite. Compl.

On January 9, 2025, Defendant was served with the summons and Complaint. Dkt. 14.

Defendant failed to answer or otherwise appear. Hence, on March 7, 2025, Plaintiff filed a request for entry of default. Dkt. 15. That same day, the Clerk of Court entered default against Defendant pursuant to Federal Rule of Civil Procedure 55(a). Dkt. 16.

On April 25, 2025, Plaintiff filed the instant Motion pursuant to Federal Rule of Civil Procedure 55(b). Dkt. 18. In support of the Motion, Plaintiff includes the declaration of Katherine M. Dugdale, dkt. 18-2, Declaration of Katherine M. Dugdale ("Dugdale Decl."), and the declaration of Michael Brews, Fortnite's Director of Ecosystem Security, dkt. 18-3, Declaration of Michael Brews ("Brews Decl.").

As of the date of this Order, Defendant has not filed an Opposition to the Motion.

This matter, thus, stands submitted.

**B.    RELEVANT FACTS**

As alleged in the Complaint, Plaintiff is a Maryland Company with its principal place of business in Wake County, North Carolina. Compl. ¶ 13. Defendant is an individual residing in Lomita, California. Id. ¶ 14.

According to the Complaint, Plaintiff is the developer and owner of Fortnite, a popular multiplayer online game released in 2017. Id. ¶¶ 1-2, 16. Fortnite players can unlock cosmetic items and compete in skill-based tournaments, including those offering cash prizes. Id. ¶¶ 3-4. Fortnite offers various tournaments, including "Battle Royale," where success is determined by players' skills rather than purchasable competitive advantages. Id. ¶¶ 17-18. To ensure fairness, Plaintiff has implemented rules and anti-cheat systems in Fortnite. Id. ¶ 25.

In order to play Fortnite, a player must agree to the Fortnite End User License Agreement ("EULA"). Id. at 7-8. Specifically, the EULA expressly prohibits players from cheating by using "programs . . . which may give players an unfair competitive advantage." Id. ¶¶ 29-31. A player must also agree to a Tournament Agreement before participating in any tournament. Id. ¶ 32. The Tournament Agreement expressly prohibits "using any kind of cheating device, program, or similar cheating method to gain a competitive advantage." Id.

Plaintiff owns numerous registered copyrights in Fortnite, covering its computer code and audiovisual elements, and "employs a variety of technological protection measures that are designed to prevent cheat users from accessing and/or violating [Plaintiff's] rights in Fortnite." Id. ¶¶ 24, 33; see also dkt. 1-1 Certificates of Copyright Registrations. "Fortnite players who are detected using or attempting to use cheat software are prevented from launching or otherwise using Fortnite, or are immediately kicked out of Fortnite." Id. ¶ 35. Plaintiff also "employs hardware ID bans against Fortnite players that are detected using cheat software. When [Plaintiff] applies a hardware ID ban to a particular player's hardware (e.g., a computer), that hardware (identified by the hardware's unique identifiers) is prevented from launching and using Fortnite." Id. ¶ 36.

///

On June 5, 2024, Plaintiff detected Defendant was using a "Direct Memory Access" ("DMA") device while competing in a Fortnite tournament, which was "specifically designed to avoid detection by [Plaintiff's] anti-cheat measures." Id. ¶¶ 38, 40. A DMA device consists of a two-computer system in which the gaming computer runs Fortnite, while the cheat computer reads the live memory of the Fortnite game and transmits the data, including Fortnite's software code, to the cheat computer via a DMA card. Id. ¶¶ 42-43, 46. The use of the DMA device allows Defendant "to avoid being detected by [Fortnite's] anti-cheat measures" and to "see other players and items through solid walls and the ability to automatically aim at other players without user inputs." Id. ¶¶ 6, 43. Plaintiff's investigation revealed Defendant "began to show evidence of cheating" around the time "Defendant was detected using a DMA device." Brews Decl., ¶¶ 6-7. Plaintiff also observed Defendant switched his play style from using a console device to a PC, given that the DMA devices are used on PCs and cannot be used on game consoles. Id. ¶ 8. Additionally, Defendant's "game play suddenly improved" after switching his play style. Id.

Upon detecting the use of the DMA device by Defendant, Plaintiff banned Defendant for cheating on June 6, 2024. Compl. ¶ 38. However, Defendant continued his wrongful conduct by creating at least three fake accounts between June 2024 and October 2024. Id. ¶¶ 39, 58. Defendant allegedly provided "false and misleading personal information" to Plaintiff while creating these fake accounts. Id. ¶ 59. Defendant also used a hardware spoofer to alter the serial numbers of his devices to evade Plaintiff's hardware ID bans and continue accessing Fortnite after being banned for cheating. Id. ¶ 47. Due to Defendant's "tools and methods that disguised his activities, [Plaintiff] was forced to expend significant resources to combat Defendant's cheating and fraud". Brews Decl., ¶ 5. Defendant used the fake accounts and participated in at least 18 Fortnite tournaments while using the DMA device. Compl. ¶ 61. "In less than four months, between June 19 and October 11, 2024, Defendant participated in at least 839 Fortnite tournament matches and earned tournament winnings at least 36 times for a combined total of at least $6,850 in tournament winnings." Brews Decl., ¶ 8. During this four-month period, Plaintiff also received 991 reports regarding Defendant's cheating from other Fortnite players who played against Defendant. Id. ¶ 9. Accordingly, Plaintiff alleges Defendant used cheat software for an unfair competitive advantage while participating in Fortnite tournaments. Compl. ¶ 6.

Plaintiff claims Defendant's wrongful conduct "damages [Plaintiff's] goodwill with the Fortnite community and the integrity of Fortnite tournaments", "undermines the integrity of Fortnite and causes non-cheating players to stop playing", and Plaintiff is harmed when "non-cheating players stop playing Fortnite including because these players no longer purchase in-game passes, cosmetics, and related items." Id. ¶¶ 69-70.

### III.
### LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) authorizes a court to enter default judgment against a party who has failed to plead or otherwise defend. Fed. R. Civ. P. 55(b)(2). The decision to grant or deny an application for default judgment is discretionary. Allstate Life Ins. Co. v. Markowitz, 590 F. Supp. 3d 1210, 1215 (C.D. Cal. 2022) (citing Aldabe v. Aldabe, 616 F.2d 1089, 1092-93 (9th Cir. 1980)).

In determining whether to enter default judgment against a party, a court considers the following factors: (1) the possibility of prejudice to the plaintiff, (2) the merits of the plaintiff's

substantive claims, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

Upon entry of default against a defendant, the court takes "'the well-pleaded factual allegations' in the complaint 'as true.'"  DIRECTV, Inc. v. Huynh, 503 F.3d 847, 854 (9th Cir. 2007) (quoting Cripps v. Life Ins. Co., 980 F.2d 1261, 1267 (9th Cir. 1992)).  However, "a 'defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.'"  Id. (quoting Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)).  "[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default."  Cripps, 980 F.2d at 1267 (citing Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)).  In addition, allegations as to the amount of damages must be proven.  TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987).

Finally, pursuant to Local Rule 55-1, an application for default judgment must be accompanied by a declaration setting forth: when, and against what party, default was entered; the pleading to which default was entered; whether the defaulting party is an infant or incompetent person; that the Servicemembers Civil Relief Act, 50 U.S.C. App. § 521, does not apply; and that notice has been served on the defaulting party, if required.  L.R. 55-1.  The party applying for default judgment must also provide the defaulting party with notice of the application if the defaulting party has appeared in the action or the applicant seeks unliquidated damages.  Fed. R. Civ. P. 55(b)(2); L.R. 55-2.

## IV.
## DISCUSSION

### A.   THE MOTION SATISFIES THE APPLICABLE PROCEDURAL REQUIREMENTS

As an initial matter, the instant Motion satisfies the procedural requirements set forth in the Federal Rules of Civil Procedure and the Court's Local Civil Rules.  Plaintiff submitted a declaration and a proof of service that complies with Local Rule 55-1.  See Dugdale Decl.; dkt. 26.  Specifically, the Dugdale declaration states (1) default was entered against Defendant on March 7, 2025, (2) default was entered for failing to respond to Plaintiff's Complaint, (3) Defendant is not infant or incompetent person, and (4) Defendant is not officer or agent of any state or in the military service under the Servicemembers Civil Relief Act.  Dugdale Decl., ¶ 9.  Plaintiff served the Motion on Defendant on April 25, 2025.  Dkt. 26.

///

///

///

///

///

**B.     THE <u>EITEL</u> FACTORS WEIGH IN FAVOR OF GRANTING DEFAULT JUDGMENT AGAINST DEFENDANT**

In addition, as discussed below, the <u>Eitel</u> factors weigh in favor of granting default judgment against Defendant.

**1.     Possibility of Prejudice to Plaintiff**

The first <u>Eitel</u> factor is "whether the plaintiff will suffer prejudice if default judgment is not entered." <u>PepsiCo, Inc. v. Cal. Sec. Cans</u>, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Here, in light of Defendant's failure to appear, Plaintiff "will likely be without other recourse for recovery." <u>See id.</u>; <u>see also</u> <u>Amini Innovation Corp. v. KTY Int'l Mktg.</u>, 768 F. Supp. 2d 1049, 1054 (C.D. Cal. 2011) (finding prejudice to plaintiff favored entering default judgment because, "[i]f the Court does not enter a default judgment, it will allow [the defendant] to avoid liability by not responding to [the plaintiff's] claims").

Accordingly, the Court finds the first <u>Eitel</u> factor weighs in favor of entering default judgment.

**2.     Merits of Plaintiff's Claims and Sufficiency of the Complaint**

The second and third <u>Eitel</u> factors are "the merits of [the plaintiff's] substantive claim" and "the sufficiency of the [claim]." <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1175. These factors, which "are often analyzed together," <u>Dr. JKL Ltd. v. HPC IT Educ. Ctr.</u>, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010), require a plaintiff to "state a claim on which the [plaintiff] may recover," <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1175. A claim "satisfies this test when the claims 'cross the line from conceivable to plausible.'" <u>Indian Hills Holdings, LLC v. Frye</u>, 572 F. Supp. 3d 872, 886 (S.D. Cal. 2021) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 680 (2009)). In performing this analysis, courts take "the well-pleaded factual allegations in the [claim] as true." <u>DIRECTV, Inc.</u>, 503 F.3d at 854 (internal quotation marks omitted).

Here, as discussed below, the allegations in the Complaint are sufficient to state a claim for each asserted cause of action. Compl. at 14-20.

**a.     Cause of Action One: Circumvention of Technology Measures in Violation of 17 U.S.C. § 1201(a) ("Section 1201(a)")**

Under Section 1201(a), it is unlawful for a person to "circumvent a technological measure that effectively controls access to a work protected under [the Digital Millennium Copyright Act ("DMCA")]". 17 U.S.C § 1201(a)(1)(A). To "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." <u>Id.</u> § 1201(a)(3)(A). A technological measure "'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." <u>Id.</u> § 1201(a)(3)(B).

Here, Plaintiff sufficiently alleges Defendant circumvented Plaintiff's technological measures that effectively control access to Fortnite, a work protected under the DMCA. As an initial matter,

Plaintiff alleges and provides proof that computer code and audiovisual elements of Fortnite were registered with the United States Copyright Office ("USCO") between 2013 and 2023, Compl. ¶ 24; see also dkt. 1-1, Certificates of Copyright Registrations, and that Fortnite was released to the public in 2017, id. ¶ 16. Accordingly, Plaintiff has sufficiently established its ownership of valid copyrights over Fortnite. 17 U.S.C. § 410(c) ("[T]he certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright."); see also Disney Enters., Inc. v. Karen & David (USA) Inc., 2010 WL 11596673, at *2 (C.D. Cal. Oct. 18, 2010).

Further, because Plaintiff alleges Fortnite employs cheat detection software and hardware ID bans, Compl. ¶¶ 35-36, Plaintiff has sufficiently alleged Fortnite is protected by technological measures. See MDY Indus., LLC v. Blizzard Ent., Inc., 629 F.3d 928, 954 (9th Cir. 2010), as amended on denial of reh'g (Feb. 17, 2011), opinion amended and superseded on denial of reh'g, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011) (ruling the anti-cheat software is a technological measure). Plaintiff also alleges Defendant circumvented Plaintiff's technological measures by using a DMA device, which allows Plaintiff "to avoid being detected by [Fortnite's] anti-cheat measures." Compl. ¶¶ 38, 40, 43. Additionally, after Defendant was banned from playing Fortnite for cheating, Defendant again circumvented Plaintiff's technological measures by using a hardware spoofer to alter the serial numbers of his devices to evade Plaintiff's hardware ID bans and continue accessing Fortnite. Id. ¶ 47.

Accordingly, the Court finds Plaintiff has sufficiently alleged Defendant circumvented Plaintiff's technological measures because Defendant's use of the DMA device and hardware spoofer bypassed Fortnite's technological measures of cheat protection software and hardware ID bans. See Activision Publ'g, Inc. v. EngineOwning UG, No. CV 22-51-MWF-JCx, 2024 WL 3444631, at *4 (C.D. Cal. May 28, 2024) (finding plaintiff has sufficiently alleged defendant circumvented plaintiff's technological measures by the use of cheating software that avoided detection by plaintiff's anti-cheating technology). Thus, for Cause of Action One, Plaintiff has sufficiently alleged a claim for the violation of Section 1201(a).

### b. Cause of Action Two: Breach of Contract

To state a claim for breach of contract under California law, a plaintiff must plead: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." Oasis W. Realty, LLC v. Goldman, 51 Cal. 4th 811, 821 (2011).

Here, Plaintiff sufficiently states a claim for breach of contract. First, Plaintiff alleges "[i]n order to download and play Fortnite, and play in Fortnite tournaments, [Defendant] agreed to be bound by the Fortnite EULA and the Tournament Agreements." Compl. ¶ 37. In support of its allegations, Plaintiff provides the Fortnite EULA and Tournament Agreements. Dkt. 1-1 at 31-171. Further, Plaintiff alleges Defendant participated in at least 18 Fortnite tournaments (and at least 839 tournament matches) while using the DMA device, and therefore, accepted and agreed to be bound by the Tournament Agreements. Compl. ¶ 61; Brews Decl., ¶ 8. Second, Plaintiff alleges it performed under the agreements by permitting Defendant to access Fortnite and participate in the Fortnite tournaments. Id. ¶¶ 37-39, 58-61, 63. Third, Plaintiff alleges the EULA and Tournament Agreements expressly prohibit the use of a cheating device to gain a competitive advantage. Id. ¶¶ 29-32. Defendant, therefore, breached the terms of the EULA and Tournament Agreements by

using the DMA device, as the DMA device allowed Defendant to "see other players and items through solid walls and the ability to automatically aim at other players without user inputs" and gain a competitive advantage. Id. ¶¶ 6, 44-45. Fourth, Plaintiff alleges this breach has damaged Plaintiff because Plaintiff "has expended significant resources investigating and combating [Defendant's] cheating and fraud." Id. ¶ 68. Additionally, Plaintiff alleges "[Defendant's] wrongful conduct damages [Plaintiff's] goodwill with the Fortnite community and the integrity of Fortnite tournaments . . . [and] undermines the integrity of Fortnite [causing] non-cheating players to stop playing", and "[Plaintiff] is harmed when non-cheating players stop playing Fortnite including because these players no longer purchase in-game passes, cosmetics, and related items." Id. ¶¶ 69-71.

Accordingly, the Court finds Plaintiff has sufficiently alleged Defendant breached his contracts with Plaintiff. See Nexon Am. Inc. v. GK, No. 5:21-CV-00886-FWS-KK, 2023 WL 3432260, at *6 (C.D. Cal. Jan. 11, 2023) (finding defendant breached the contract by agreeing to the End User License Agreement through installation and use of the game, then later hacking the game and profiting from the hacks.) Thus, for Cause of Action Two, Plaintiff has sufficiently alleged a claim for breach of contract.

   **c. Cause of Action Three: Direct Copyright Infringement in violation of 17 U.S.C. § 501 et seq. ("Section 501")**

In order to establish a prima facie claim for copyright infringement, Plaintiff must demonstrate: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 636 (9th Cir. 2008) (quoting Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002)). With respect to ownership, "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c); see also Disney Enters., Inc., 2010 WL 11596673, at *2. With respect to copying, this element can be shown by demonstrating: (1) the defendant had access to the copyrighted work; and (2) the original and the reproduced works are substantially similar. Jada Toys, Inc., 518 F.3d at 636-37; see also 4-13 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.01[A] at 13:7 (2010) (explaining that under the second prong, an inference of actual copying may be deduced from similarity between two works based on the substantial similarity theory).

Here, as discussed above, Plaintiff has sufficiently established its ownership of copyrights for the computer code and audiovisual elements of Fortnite. Further, Plaintiff alleges Defendant engaged in copyright infringement by using cheat software. Compl. ¶ 94. Specifically, in order for Defendant's cheat software to "operate in connection with Fortnite, the cheat software contains copied portions of the Fortnite software code within the cheat software. Each time the cheat software is run on a computer, a copy of the cheat software code—and thus the copied portions of the Fortnite code—is created." Id. ¶ 46. Accordingly, Defendant copied Plaintiff's copyright-protected computer code. See MAI Sys. Corp. v. Peak Comput., Inc., 991 F.2d 511, at 518 (9th Cir. 1993) (upholding the lower court's ruling that "copying for purposes of copyright law occurs when a computer program is transferred from a permanent storage device to a computer's RAM.").

Thus, for Cause of Action Three, Plaintiff has sufficiently stated a claim for copyright infringement in violation of Section 501.

### d. Cause of Action Four: Fraud in the Inducement

Under California law, to establish a claim for fraud, a plaintiff must show "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." Lazar v. Superior Ct., 12 Cal. 4th 631, 638 (1996). Further, fraud-based allegations in federal court are also governed by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). "Rule 9(b) demands that, when averments of fraud are made, the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge[.]" Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). Put differently, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Id. (citing Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997); see also Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007). "The time, place, and content of an alleged misrepresentation may identify the statement or the omission complained of, but these circumstances do not 'constitute' fraud." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1547-48 (9th Cir. 1994). "The statement in question must be false to be fraudulent." Id. at 1548. It is insufficient for a plaintiff to "set forth conclusory allegations of fraud . . . punctuated by a handful of neutral facts." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). As such, a plaintiff is required to set forth "an explanation as to why the statement or omission complained of was false or misleading." In re GlenFed, Inc. Sec. Litig., 42 F.3d at 1548. However, Rule 9(b) states, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Therefore, "a party is not required to plead with specificity the alleged wrongdoer's state of mind." Body Jewelz, Inc. v. Valley Forge Ins. Co., 241 F. Supp. 3d 1084, 1089 (C.D. Cal. 2017) (citing Concha v. London, 62 F.3d 1493, 1503 (9th Cir. 1995)).

Here, Plaintiff first alleges that on June 6, 2024, Plaintiff banned Defendant from Fortnite for using a DMA device to cheat, Compl. ¶ 38, but Defendant subsequently created at least three new accounts using false personal information to conceal his identity on June 21, June 25, and July 29, 2024, id. ¶¶ 58-59. Therefore, "[b]y creating the Epic accounts and accepting the Fortnite EULAs and the Tournament Agreements, [Defendant] repeatedly misrepresented to [Plaintiff] that he intended to comply with the contracts, despite having no intention of doing so and, for accounts used after he was banned, despite knowing that his authorization to access Fortnite and [Plaintiff's] services had already terminated." Id. ¶ 62. Second, Plaintiff alleges Defendant intended to induce Plaintiff's reliance because Plaintiff had banned Defendant's account previously due to the cheating. Id. ¶ 63. Third, Plaintiff alleges it "relied on these misrepresentations in order to unknowingly grant [Defendant] access to Epic's services, including Fortnite", and the reliance is justified because "[Defendant] took steps to conceal his true identity." Id. Finally, Plaintiff alleges damages as a result of Defendant's conduct. See Id. ¶¶ 69-71. Accordingly, Plaintiff has stated a claim for fraudulent inducement. See Bungie, Inc. v. L.L., No. 2:22-CV-0981-RAJ, 2023 WL 3318588, at *2 (W.D. Wash. May 9, 2023) (finding the plaintiff sufficiently stated a fraudulent inducement claim based on reliance on the defendant's purported acceptance of the Limited Software License Agreement upon creating a new account, despite the defendant having created thirteen new accounts after each cheating-related ban).

Thus, for Cause of Action Four, Plaintiff has sufficiently stated a claim for fraudulent inducement.

* * *

Accordingly, the Court finds the second and third <u>Eitel</u> factors weigh in favor of entering default judgment.

### 3. Sum of Money at Stake

The fourth <u>Eitel</u> factor is "the amount of money at stake in relation to the seriousness of [the defendant's] conduct." <u>PepsiCo. Inc.</u>, 238 F. Supp. 2d at 1176-77. The court must "assess whether the recovery sought is proportional to the harm caused by" the defendant. <u>Landstar Ranger, Inc. v. Parth Enters., Inc.</u>, 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010).

Here, Plaintiff seeks $276,750 in damages, consisting of $167,800 in statutory damages pursuant to the DMCA, $100,000 in statutory damages pursuant to the Copyright Act, and $8,950 for attorneys' fees and costs. Mot. at 16-20. Specifically, with respect to statutory damages pursuant to the DMCA, Plaintiff seeks "$200 each of the 839 matches in which [Defendant] likely used DMA cheat software for a total of $167,800 in DMCA statutory damages". <u>Id.</u> at 19. The Court finds the amount of money at stake is proportional and tailored to Defendant's alleged statutory violations. <u>See</u> <u>Sony Interactive Ent. LLC v. Scales</u>, No. EDCV 18-2141-JGB-KKx, 2019 WL 13065920, at *5 (C.D. Cal. Mar. 18, 2019) (finding the plaintiff's request of $16,800 in statutory damages for DMCA violations appropriate where the plaintiff sought $200 for each of the 76 pre-installed pirated video games); see also <u>VBConversions LLC v. Gulf Coast Ventures, Inc.</u>, No. CV 12-8265-JGB-AGRx, 2016 WL 11687660, at *6 (C.D. Cal. Aug. 10, 2016). The Court also finds the amount sought for attorneys' fees and costs to be reasonable. As discussed below, however, the Court finds the amount of statutory damages sought pursuant to the Copyright Act to be excessive, and therefore, denies Plaintiff's request for $100,000 in statutory damages pursuant to the Copyright Act. <u>See</u> Section IV.C.1.b.

Accordingly, the Court finds the fourth <u>Eitel</u> factor weighs in favor of entering default judgment.

### 4. Possibility of Dispute Concerning Material Facts

The fifth <u>Eitel</u> factor is "the possibility of dispute as to any material facts in the case." <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1177. Here, because default has been entered against Defendant, <u>see</u> dkt. 16, the Court takes "the well-pleaded factual allegations in the [Complaint] as true[,]" <u>see</u> <u>DIRECTV, Inc.</u>, 503 F.3d at 854 (internal quotation marks omitted), except insofar as they pertain to the amount of Plaintiff's damages, <u>see</u> <u>TeleVideo Sys., Inc.</u>, 826 F.2d at 917-18. Hence, no genuine dispute of material facts would preclude entry of default judgment. <u>See</u> <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1177 (concluding no genuine dispute of material facts would preclude entry of default judgment because, "[u]pon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages").

Accordingly, the Court finds the fifth <u>Eitel</u> factor weighs in favor of entering default judgment.

///

### 5. Excusable Neglect

The sixth Eitel factor is "the possibility that the default resulted from excusable neglect." PepsiCo, Inc., 238 F. Supp. 2d at 1177. Here, Defendant was served with the summons and Complaint on January 9, 2025. Dkt. 14. Plaintiff also notified Defendant's counsel of the entry of default on March 10, 2025. Dugdale Decl., ¶ 7. Notably, Defendant's counsel was in communication with Plaintiff's counsel regarding a stipulation to set aside the default, id., however, Defendant nonetheless failed to answer, file an opposition to the instant Motion, or otherwise appear. The Court, therefore, finds it unlikely that Defendant's default resulted from excusable neglect. See Shanghai Automation Instrument Co. v. Kuei, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001) (finding default could not "be attributed to excusable neglect" where defendants "were properly served with the Complaint, the notice of entry of default, as well as the papers in support of the instant motion").

Accordingly, the Court finds the sixth Eitel factor weighs in favor of entering default judgment.

### 6. Strong Policy Favoring Decisions on the Merits

The seventh Eitel factor is the strong policy favoring decisions on the merits. See Eitel, 782 F.2d at 1472. While the policy favoring decisions on the merits "always weighs against default judgment," Amini Innovation Corp., 768 F. Supp. 2d at 1056, this factor, "standing alone, is not dispositive." PepsiCo, Inc., 238 F. Supp. 2d at 1177. Here, Defendant's apparent unwillingness to participate in this aspect of the litigation "makes a decision on the merits impractical, if not impossible." See id. Thus, the policy favoring decisions on the merits does not preclude entering default judgment. See id.; see also Wecosign, Inc. v. IFG Holdings, Inc., 845 F. Supp. 2d 1072, 1083 (C.D. Cal. 2012) (finding default judgment appropriate when "a decision on the merits is impossible").

\* \* \*

Accordingly, the Eitel factors strongly weigh in favor of default judgment on Plaintiff's claims. Therefore, the Court finds default judgment against Defendant is appropriate.

### C. PLAINTIFF'S REQUESTED RELIEF

In seeking default judgment, the moving party "has the burden of proving damages through testimony or written affidavit." Bd. of Trs. of the Boilermaker Vacation Tr. v. Skelly, Inc., 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005). A default judgment may be entered without a hearing if the amount claimed is "capable of mathematical calculation." Davis v. Fendler, 650 F.2d 1154, 1161 (9th Cir. 1981) (citation omitted).

Here, Plaintiff seeks $167,800 in statutory damages pursuant to the DMCA, $100,000 in statutory damages pursuant to the Copyright Act, $8,950 for attorneys' fees and costs, and a permanent injunction against Defendant. Mot. at 22. As discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's requested relief.

///

      **1.**      **Statutory Damages**

Generally, "the court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." Peer Int'l Corp. v. Pausa Recs., Inc., 909 F.2d 1332, 1336 (9th Cir. 1990); see also Dream Games of Arizona, Inc. v. PC Onsite, 561 F.3d 983, 993 (9th Cir. 2009).

      **a.**      **DMCA**

Pursuant to 17 U.S.C. § 1203(c)(3) ("Section 1203(c)(3)"), "[a]t any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just." 17 U.S.C. § 1203(c)(3).

Here, Plaintiff seeks an award of statutory damages using the minimum award of $200 for each of Defendant's violations of DMCA, i.e., use of the DMA device while participating in Fortnite tournaments. Mot. at 18. While Plaintiff contends "it is impossible to know the true scope of Defendant's cheating activities because the DMA device and cheat software are designed to avoid [Plaintiff's] anti-cheat technological protection measures[,]" Plaintiff's determination of Defendant's number of violations is supported by an investigation that traced accounts to Defendant. Id. Specifically, Plaintiff's investigation revealed "[a]round the time [Plaintiff] detected Defendant using a DMA device, Defendant's play style suddenly changed" from using a console device to a PC, which aligns with the fact that the DMA devices are used on PCs and cannot be used on game consoles. Id. Defendant began winning money after switching his play style. Id. "In less than four months, between June 19 and October 11, 2024, Defendant participated in at least 839 Fortnite tournament matches and earned tournament winnings at least 36 times for a combined total of at least $6,850 in tournament winnings." Id. During this four-month period, Plaintiff also received 991 reports for cheating from other Fortnite players who played against Defendant. Id. Based on the above, Plaintiff alleges Defendant used the DMA device in each of the 839 Fortnite tournament matches. Id. Plaintiff, therefore, requests the award of the DMCA statutory minimum of $200 for each of the 839 tournament matches in which Defendant allegedly used the DMA device for a total of $167,800 for DMCA statutory damages. Id. at 18-19. While the Court notes the amount sought by Plaintiff exceedingly surpasses Defendant's alleged actual gain, $6,850, Defendant took significant measures to conceal the true scope of his cheating activities by creating multiple fake accounts and employing a hardware spoofer to circumvent detections. Compl. ¶¶ 47-48, 51-52, 56-61. Additionally, Defendant's refusal to participate in the instant action presents a significant challenge in determining the damages. Further, Plaintiff's request is "appropriate as it reflects the minimum number of DMCA violations committed by Defendants, multiplied by the minimum amount mandated by the DMCA." Netdragon Websoft, Inc. v. Toft, No. CV 11-1037-GHK-PLAx, 2012 WL 13008123, at *4 (C.D. Cal. Apr. 24, 2012). Accordingly, Plaintiff has established entitlement to $167,800 in DMCA statutory damages.

      **b.**      **Copyright Infringement**

Pursuant to 17 U.S.C. § 504(c) ("Section 504(c)"), a plaintiff may elect to recover an award of either actual or statutory damages for copyright infringement. 17 U.S.C. § 504(c)(1). Further, a plaintiff may recover "with respect to any one work, for which any one infringer is liable

individually, . . . in a sum of not less than $750 or more than $30,000" and, if that "infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." Id. "In regard to allegations of willfulness, they are deemed to be true on default . . . [w]hen it is alleged that a defendant willfully infringed a copyrighted work, the Court must take these allegations as true." Strike 3 Holdings, LLC v. Doe, No. 18-CV-01173-TSH, 2019 WL 1277561, at *7 (N.D. Cal. Mar. 20, 2019) (citations and internal quotation marks omitted). "The number of awards available under this provision depends not on the number of separate infringements, but rather on (1) the number of individual 'works' infringed and (2) the number of separate infringers." Desire, LLC. v. Manna Textiles, Inc., 986 F.3d 1253, 1264 (9th Cir. 2021) (citations and internal quotation marks omitted).

Further, "[c]ourts have applied the following factors in cases involving the statutory damages provision of [Section 504(c)]: restitution of profit, reparation of injury, and deterrence of future infringement." Stokes v. Jerry James, Inc., No. CV 22-6708-PA-RAOx, 2023 WL 2347426, at *2 (C.D. Cal. Jan. 10, 2023) (citations and internal quotation marks omitted). "Courts have also considered whether the amount of damages requested bears a plausible relationship to Plaintiff's actual damages." Morex Enters., Inc. v. Shop Q, Inc., No. CV 20-8118 PA-JPRx, 2021 WL 3520728, at *2 (C.D. Cal. Feb. 17, 2021) (citation modified). Specifically, "while a plaintiff in a copyright action is entitled to damages that will serve as a deterrent, the plaintiff is not entitled to a windfall[.]" Nexon Am. Inc. v. Kumar, No. 2:11-CV 06991-ODW, 2012 WL 1116328, at *7 (C.D. Cal. Apr. 3, 2012) (citations and internal quotation marks omitted).

Here, the Court finds Plaintiff's request of $100,000 in statutory damages for copyright infringement to be excessive. First, Plaintiff's Motion fails to make any effort to quantify the lost profit caused by Defendant's infringement, other than the amount Defendant allegedly won in tournaments in which Defendant allegedly cheated. Second, given the Court's finding Plaintiff has established entitlement to $167,800 in DMCA statutory damages, additional $100,000 statutory damages under Section 504(c) would constitute a significant windfall to Plaintiff, exceeding any amount necessary to deter future infringement. Third, the award sought here bears little plausible relationship to Plaintiff's actual damages, as Defendant only won a combined total of $6,850 in tournaments where he allegedly cheated. Mot. at 18. Accordingly, the Court exercises its wide discretion and concludes Plaintiff is entitled only to the minimum of the statutory damage of $750 under Section 504(c) for the infringed work, Fortnite, in the instant action. See Stokes, 2023 WL 2347426, at *3 (finding the plaintiff's request for the maximum $20,000 in statutory damages for infringement of three of the plaintiff's copyrighted images to be excessive, and the plaintiff was only entitled to a statutory damages of $3,000 ($1,000 for each of the three infringed works)); see also Strike 3 Holdings, 2019 WL 1277561, at *7 (finding the plaintiff's request of minimum statutory amount of $750 for each work infringed, for a total of $9,000, to be reasonable).

### 2. Permanent Injunctive Relief

The Copyright Act authorizes courts to issue permanent injunctions to "prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The DMCA also authorizes injunctive relief "to prevent or restrain a violation" of the DMCA. 17 U.S.C. § 1203(b)(1). A plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is

warranted; and (4) that the public interest would not be disserved by a permanent injunction. eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).

Here, the Court finds a permanent injunction is warranted. First, Plaintiff has sufficiently alleged it suffered irreparable harm to its goodwill and the integrity of its competitive Fortnite community as a result of Defendant's ongoing wrongful conduct, which has triggered over 900 player complaints and will continue absent injunctive relief. Mot. at 21. Second, monetary damages are inadequate to compensate for this harm, particularly given the reputational damage and Defendant's failure to appear in the case, which offers no assurance that he will cease his misconduct. Third, the balance of hardships favors Plaintiff because the injunction would merely prohibit Defendant from continuing to violate the DMCA and infringe Plaintiff's copyrights. Lastly, the public interest strongly supports injunctive relief, as "the public receives a benefit when the legitimate rights of copyright holders are vindicated." Netdragon Websoft, Inc., 2012 WL 13008123, at *5 (citation omitted). Accordingly, Plaintiff is entitled to injunctive relief. See id.

### 3. Attorneys' Fees and Costs

Local Rule 54-1 states, "[t]he 'prevailing party' entitled to costs under Federal Rule of Civil Procedure 54(d) is the party in whose favor judgment is entered, unless otherwise determined by the Court." Further, both the DMCA and the Copyright Act allow recovery of reasonable attorneys' fees and costs for the prevailing party. See Sony Computer Ent. Am., Inc. v. Divineo, Inc., 457 F. Supp. 2d 957, 967 (N.D. Cal. 2006); Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1065 (N.D. Cal. 2010).

Here, Plaintiff calculated its attorneys' fees using the schedule in Local Rule 55-3. Mot. at 20. Local Rule 55-3 establishes a schedule for calculating reasonable attorneys' fees upon entry of default judgment based on the amount of the judgment. L.R. 55-3. For judgments over $100,000, the fees shall be $5,600 plus 2% of the amount over $100,000. Id. Based on the above, the Court finds Plaintiff is entitled to a total of $168,550 for violations of the DMCA and the Copyright Act. Accordingly, pursuant to the schedule set forth in Local Rule 55-3, Plaintiff is entitled to $6,971 in attorneys' fees ($5600 plus 2% of the amount over $100,000).

## V.
## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Default Judgment is **GRANTED**, Plaintiff's requested relief, however, is **GRANTED IN PART** and **DENIED IN PART**. The Court, therefore, **ORDERS** judgment to be entered in favor of Plaintiff against Defendant in the amount of $175,521.

Additionally, Defendant and his officers, agents, representatives, servants, employees, heirs, successors, and assigns, and all others in active concert or participation with Defendant, are hereby enjoined as follows:

       1.    Infringing, or inducing, contributing, or enabling others to infringe, Plaintiff's copyrights;

    2.    Downloading, installing, possessing, and/or using any of Plaintiff's copyrighted works, including but not limited to Fortnite;

    3.    Circumventing any of Plaintiff's technological measures that control access to Plaintiff's copyrighted works, including but not limited to Fortnite;

    4.    Using any software or device not authorized by Plaintiff that provides Fortnite players a competitive advantage in Fortnite; and

    5.    Aiding or assisting another person or entity in any of the activities described in (a)–(d) above.

**IT IS SO ORDERED**.